LUIS JIMÉNEZ MONTALVO, JUAN JIMÉNEZ FIGUEROA y MARÍA MATILDE MARTY JIMÉNEZ por sí y representada por su esposo ARMANDO SIFRE, demandantes y apelantes, *v.* JOSÉ JIMÉNEZ FONT, demandado y apelado.

Número 11240.

*Sometido:* 11 de mayo de 1954. *Resuelto:* 17 de junio de 1954.

720

*E. Alcaraz Casablanca,* abogado de los apelantes; *José Sabater,* abogado del apelado.

EL JUEZ ASOCIADO SEÑOR ORTIZ emitió la opinión del tribunal.

Esta apelación envuelve una impugnación a la validez de un testamento otorgado el 21 de enero de 1953 por María del Pilar Jiménez Font, quien falleció el día primero de febrero de 1953 a la edad de noventa años. La demanda de Nulidad de Testamento, interpuesta por unos sobrinos de la testadora contra un hermano de ella que fué instituído en el testamento como único y universal heredero, se basa en las alegaciones de que, al tiempo de otorgarse el testamento, ella no estaba en su cabal juicio; que de haber estado ella incidentalmente en un momento de lucidez al otorgarse el testamento, "no comparecieron en el testamento dos médicos para atestiguar ese hecho, teniendo uno de los testigos conocimiento de la incapacidad de la testadora, lo que así había declarado bajo juramento ante el Honorable Tribunal Superior de Mayagüez, con anterioridad al acto del otorgamiento del testamento", y que el testamento había sido otorgado mediante el dolo y el fraude. La Sala de Mayagüez del Tribunal Superior dictó sentencia declarando sin lugar la demanda, después de haber considerado la prueba presentada. Concluyó el tribunal a quo que la testadora tenía la capacidad nece-

saria al tiempo de otorgarse el testamento; que no era necesario el que el notario hubiese designado, en virtud de las disposiciones del art. 614 del Código Civil, dos facultativos que hubiesen previamente reconocido a la testadora y que hubiesen dado fe de su capacidad en el testamento, y que ello no era necesario porque la demencia o incapacidad de la testadora no había sido previamente declarada por tribunal alguno, concluyendo además el tribunal a quo que no había mediado fraude, dolo o violencia de clase alguna.

Los demandantes han apelado de la sentencia para ante este Tribunal y han señalado los siguientes errores:

"Primer Error: Que el tribunal inferior cometió error al concluir como concluyó que el Notario no tenía que cumplir con las disposiciones del art. 614 del Código Civil, ed. de 1930.

"Segundo Error: Que el tribunal inferior cometió error al concluir como concluyó que los demandantes no probaron la locura de la testadora en el acto del otorgamiento del testamento.

"Tercer Error: Que el tribunal inferior cometió error al concederle crédito a la declaración del Doctor Maximiliano Almonte al efecto de que la testadora estaba lúcida en el acto del otorgamiento del testamento.

"Cuarto Error: Que el tribunal inferior cometió error al concluir como concluyó que el testamento así otorgado es válido."

██ Debemos referirnos, en primer término, a la alegación de los demandantes-apelantes al efecto de que la testadora no estaba en su cabal juicio al otorgarse el testamento. Es un hecho incontestable que en el testamento, el notario autorizante y los tres testigos instrumentales hacen constar en el mismo que, a su juicio, la testadora tenía en dicho acto la capacidad legal necesaria para testar y que la testadora había expresado voluntariamente su voluntad al notario y a los testigos. Se dice en el testamento "que uno de los testigos instrumentales es el doctor en medicina y cirugía don Maximiliano Almonte, quien es al mismo tiempo el médico de cabecera de la testadora y quien manifiesta, después de haber examinado a la testadora en presencia de todos, que la testadora está en toda su lucidez mental y con facultad y capa-

cidad para otorgar este testamento, aunque se encuentra en cama debido a su avanzada edad y debilidad general". También es un hecho incontrovertido que, según concluyó el tribunal sentenciador, "la testadora nunca había sido judicialmente declarada loca o incapaz, si bien el propio demandado había iniciado el día 14 de noviembre de 1951 expediente bajo el número T-1819 ante el antiguo Tribunal de Distrito de Mayagüez solicitando la declaración de incapacidad de la testadora y el nombramiento de tutor para gobernar su persona y administrar sus bienes. Dicho expediente quedó inconcluso, no obstante haberse celebrado la vista correspondiente el día 21 de noviembre de 1951, por no haber demostrado interés el promovente en su terminación".

Se hace preciso el formular un breve resumen de la prueba practicada, con respecto a la cuestión de la alegada incapacidad mental de la testadora.

La primer testigo de los demandantes, doña María Matilde Marty Jiménez, declaró que ella era sobrina de la testadora, doña María del Pilar; que ella visitó a su tía varias veces, en los últimos días de la vida de la testadora, cuando ella estaba en cama, pero que no podía hablar con ella porque el demandado lo impedía; que en una ocasión su tía estaba acostada en el suelo, a principios del mes de enero de 1953; que "la colchoneta estaba desbaratada"; que la testadora no tenía pelo, porque le habían cortado todo el pelo; que antes de su última enfermedad la testadora siempre estaba andando por las calles; que en muchas ocasiones ella hablaba mucho, de tonterías y cosas sin importancia y tenía la manía de que la envenenasen y acusaba a "todo el mundo" de que la trataban de envenenar; y tenía la manía de decir que le habían robado todas las prendas, "los hijos de Pepe", pero dijo la testigo que, como cuestión de hecho, los hijos de Pepe tenían las prendas desde hacía mucho tiempo; que la testadora decía "que la amenazaban, que le querían quitar lo que tenía y que la querían envenenar"; que "ella no podía vivir

con Pepe porque Pepe la amenazaba para que le diera el dinero que ella tenía"; que Pepe es el demandado José Jiménez Font.

El testigo del demandante, William Cordero, declaró que hacía veinte o veinticinco años que conocía a doña María del Pilar; que un año o año y medio antes del juicio él, como contratista de obras, empezó a construirle una obra a ella; que no la terminó porque no se pudieron poner de acuerdo en cuanto a la segunda parte del contrato "porque ella creía que yo pedía más de lo que valía la obra"; que ellos no habían formalizado contrato alguno; que cuando el testigo empezó a trabajar en los cimientos de la obra, ella habló con dos o tres contratistas más, "encontró que se la hicieran más barata y la cesaron"; que a los fines de tratar de firmar el contrato, ella y el testigo visitaron a varios abogados; que no firmaron el contrato porque el testigo exigía que le adelantaran dinero y ella no quería, ya que ella creía que el testigo pedía más de lo que valía la obra; que ella insistía en no adelantarle al testigo parte del dinero, sino en pagarle según él fuera haciendo la obra. Incidentalmente, lo que demuestra la declaración de este testigo es que la testadora tenía un grado adecuado de capacidad mental para proteger sus intereses.

El testigo del demandante Vicente Guardiola declaró que él es bombero y conocía a doña María del Pilar desde hacía quince años; que ella hablaba con los bomberos y decía que "cuando ella se muriera le iba a dejar la herencia a los bomberos"; que ella cruzaba las calles sin fijarse en los carros y cuando alguna persona trataba de ayudarla ella decía que no; que un día el testigo trató de ayudarla y ella le dijo: "No me toque; yo no quiero que los hombres me toquen", y que entonces ella tenía más de 85 años de edad. En la repregunta declaró el testigo que el incidente ocurrido entre él y ella al ella cruzar la calle, ocurrió como tres años antes del 21 de julio de 1953, fecha de la celebración del juicio.

El testigo del demandante, Armando Y. Cifre declaró que él vió a doña María del Pilar en la corte, el día en que se es-

taba presentando la prueba en un expediente de incapacidad de ella (21 de noviembre de 1951) y que entonces ella dijo "que no quería quedarse allí porque entre el juez y los que estaban allí querían hacerle un rancho"; que ella se quería ir porque "me quieren declarar loca. Empezando por Pepe, que me quiere declarar loca"; y que entonces ella se fué.

Juan Jiménez Figueroa, sobrino de la testadora, declaró que él vió a la testadora en los útimos días de su vida, y que no se entendía bien lo que ella decía; que ella se quejaba, pero era "de unos golpes que se había dado, parece que esos golpes se le infectaron y le dolían y se quejaba, tenía las piernas y la manos hinchadas".

El testimonio que hemos reseñado, de testigos que declararon en cuanto a las actuaciones, expresiones y condiciones físicas de la testadora, no fueron suficientes para demostrar que la testadora estuviese incapacitada mentalmente, o que no estuviese en su cabal juicio, al tiempo de otorgarse el testamento. Tal testimonio la caracteriza como una mujer de edad avanzada, con las debilidades y achaques inherentes a esa edad, pero aún con suficiente discernimiento para proteger sus intereses hasta cierto punto. Ella exhibía ciertas excentricidades, pero, tal como resolvimos en el caso de *Ortiz* v. *Bermúdez*, 70 D.P.R. 707, 712, las excentricidades no son sinónimas de insanidad mental, y no se debe confundir la locura con la simple rareza o excentricidad de carácter del testador.

■■ El problema real que se presenta en este caso se refiere al testimonio de los peritos de ambas partes que declararon en este caso, y a la apreciación que de esa prueba pericial hizo el tribunal sentenciador. Por los demandantes declararon los doctores Pablo Guardiola y Andrés Augusto Rodríguez García, y por el demandado declaró el doctor Maximiliano Almonte.

El perito del demandante, el doctor Pablo Guardiola declaró, en síntesis, lo siguiente:

Vió en varias ocasiones a doña María del Pilar durante los últimos tres años antes de su muerte, y en el último mes de su enfermedad la vió tres o cuatro veces; ella "tenía una caspa fuertísima, una erupción en el cuero cabelludo"; esa es una enfermedad que a los ancianos les da con mucha frecuencia; la última vez que él la vió fué como diez días antes de ella morir; cuando él la vió la última vez, ella padecía de la misma condición en que estaba en agosto del 1952, esto es, ella tenía una "psicosis senil", que se conoce como demencia senil; es un estado de anormalidad; la psicosis senil no es curable, es progresiva; se debe a cambios circulatorios de la corteza cerebral, que producen degeneración cerebral; esos cambios circulatorios se deben al proceso de envejecimiento en sí; en este caso eran producidos por la edad; ella tenía úlceras en la piel; en la certificación de defunción el doctor atribuyó su muerte a arteriosclerosis y a un estado de toxemia; en los meses en que él la vió, ella estaba desorientada totalmente; ella contestaba las preguntas del testigo en forma irracional; "una persona que está en un estado de psicosis senil, en mi concepto, no está capacitada para hacer transacciones"; el estado de psicosis senil tiene períodos de lucidez en su comienzo; después de una persona estar en un estado avanzado, casi nunca tiene períodos de lucidez; ella "estaba en un estado bastante avanzado de senilidad . . . ella estaba en el estado tóxico de la infección del costado, que eso es un agravante"; el testigo no puede contestar si ella tenía períodos lúcidos, "porque tendría que ser una persona que está 24 horas con ella y observarla"; normalmente esas personas tienen períodos de lucidez; en el tiempo en que el testigo la vió ella no tuvo períodos de lucidez; ella no conversaba en forma clara; se entendía con dificultad lo que ella decía, "había que hablarle bien cerca del oído y levantar bastante la voz para que ella pudiera oír". En la repregunta se le preguntó si él la había visto el 21 de enero de 1953, fecha en que ella otorgó el testamento, y el testigo contestó que él no sabe qué día fué que ella hizo el testamento. A pre-

guntas de la corte declaró que él no puede excluir la posibilidad de un intervalo lúcido "porque en estos casos siempre es posible"; la locura senil tiene un número de síntomas característicos, el paciente no recuerda los hechos recientes, pero recuerda los hechos ocurridos con muchos años de anterioridad; ella se acordaba de hechos remotos pero no de los recientes; una persona puede perder la memoria por una impresión fuerte; las características que exhibía ella coincidían en todas las últimas visitas que el doctor le hizo; el estado tóxico y la demencia se confunden; una persona puede perder la memoria sin perder el conocimiento; doña María del Pilar estaba loca, demente, cuando el testigo la vió; la demencia senil es progresiva y podría admitir intervalos lúcidos, pero no con mucha probabilidad; el testigo llegó a sus conclusiones como resultado de ambos casos, de demencia senil y de la infección.

El doctor Andrés Augusto Rodríguez García declaró, como testigo de los demandantes, que él visitaba a doña María del Pilar, a fines del año 1951; que "el examen mental de ella fué uno que reveló un paciente con síntomas muy parecidos si no idénticos a los de un paciente que tiene moderada demencia senil"; la demencia senil es progresiva y empeora con el tiempo.

El demandado presentó al doctor Maximiliano Almonte como su testigo y perito. El doctor Almonte fué testigo en el testamento e hizo constar que la testadora, al hacer el testamento, estaba en toda su lucidez mental y con facultad y capacidad para otorgar el testamento. Declaró lo siguiente:

Conoció por los últimos cuatro años a doña María del Pilar; el 21 de enero de 1953 él fué testigo en el testamento, estuvo allí presente y estaba ella; el notario Lcdo. José Sabater leyó el testamento y ella dijo que estaba aprobado y que ella estaba conforme, y firmó el testamento en presencia del testigo y de los otros testigos; el testigo podía hablar con ella y ella hablaba correctamente, naturalmente; ella estaba en su capacidad "a lo que hablaba con ella; ella hablaba

con nosotros y estaba completamente despejada"; tenía capacidad absoluta para saber lo que se estaba haciendo; el notario le dijo a ella que él venía a hacer el testamento y que el heredero de ella era su hermano José Jiménez Font, y ella contestó que estaba muy bien; que el testigo la visitaba a ella en muchas ocasiones, y él nunca pudo apreciar en ella un estado de confusión; él la visitaba durante las dos o tres semanas antes de su muerte y ella preguntaba por toda la familia; el demandado no estaba presente cuando se hizo el testamento; que él nunca pudo apreciar en ella un estado subnormal, y siempre la conceptuó capacitada.

En el contrainterrogatorio la parte demandante preguntó ampliamente al testigo sobre una declaración que él había prestado anteriormente, en un procedimiento de incapacidad mental de doña María del Pilar, interpuesto por el demandado, a los fines de demostrar que el testigo había expuesto, en ese procedimiento, el 21 de noviembre de 1951, manifestaciones contradictorias a las expresadas por él en el juicio celebrado en este caso. En ese procedimiento anterior el testigo había declarado, en síntesis, lo siguiente:

Ella tiene un estado mental subnormal, por su estado senil, "ella tiene arriba de ochenta u ochenta y ocho años. Me parece bien físicamente, pero su estado mental . . . la considero incapacitada para toda transacción, por su estado subnormal de su inteligencia, . . . pero no está demente". Es un estado senil, subnormal, de inteligencia, pero no está demente. "Es una incapacidad su estado físico, pero es una clase de locura, la locura senil". Es una locura motivada exclusivamente por su edad, pero "yo no la declararía loca, yo la declararía incapacitada por su estado senil, su estado subnormal". La senilidad afecta el cerebro de una persona y es progresiva; el testigo no haría transacciones de dinero con ella debido a su estado senil; pero ella está lúcida, "durante las horas que yo la he tratado durante el día ha estado completamente lúcida"; ella no es idiota, ni imbécil ni morona; ella se sabe defender; que ella no puede hacer buenos nego-

cios; el testigo insiste en que "no la puede declarar loca"; su estado es subnormal debido a su senilidad, pero no está loca; "su mente está desbalanceada y no puede apreciar muchos hechos de su vida precisamente por su estado mental, pero "el estado de ella no es definitivamente loca, un estado subnormal de inteligencia. Ese es el punto de vista ahora que va progresando y que vendrá con los años . . . pero hasta el presente es un estado subnormal de inteligencia". La cree incapacitada para administrar sus bienes, desde ese punto de vista; ella, en su conversación, se conduce como persona normal.

Al interrogarle sobre esa declaración en la vista de este caso, el testigo expuso que por su incapacidad física, inherente, orgánica, ella padecía de demencia senil, pero no era un estado de confusión, y dijo lo siguiente: "Yo recuerdo que dije incapacitada desde el punto de vista orgánico, por un estado de la vejez, pero yo declaré que siempre que tuve oportunidad de tratarla estaba completamente lúcida. Lo que quise decir, por su estado avanzado de edad. Un estado orgánico, no mental".

La declaración anterior del doctor Almonte es algo confusa, y, aparentemente, hubo algunas contradicciones entre ambos testimonios. Pero, no obstante ello, el tribunal sentenciador en el caso de autos le impartió entero peso y credibilidad al testimonio del doctor Almonte en este caso, en cuanto a su afirmación al efecto de que la testadora estaba mentalmente capacitada al tiempo de otorgarse el testamento. El tribunal sentenciador, al formular la conclusión de hecho de que ella estaba en su cabal juicio al otorgarse el testamento, decidió aceptar, e impartirle preferencia, a la opinión del doctor Almonte en cuanto a la capacidad mental suficiente de la testadora al otorgar el testamento. En sus conclusiones, el tribunal a quo dijo lo siguiente:

"De pretender los demandantes descansar en la presunción de continuidad del estado mental de la testadora días antes de otorgarse el testamento impugnado, descrito por el

doctor Guardiola . . . concluímos que cualquier presunción al efecto quedó destruída por el testimonio del doctor Maximiliano Almonte en el juicio y por la declaración de dicho testigo, del notario autorizante y de los demás testigos del testamento al efecto de que, al otorgarse éste, la testadora tenía la capacidad necesaria para testar."

Las aparentes contradicciones en las declaraciones del doctor Almonte pueden ser explicadas en virtud de la tesis, que discutiremos más adelante, al efecto de que la senilidad anterior no es incompatible con el hecho de que la testadora haya tenido suficiente capacidad mental al otorgarse el testamento. Ese fué el punto de vista del tribunal sentenciador.

Hemos reseñado extensamente el testimonio de los peritos médicos de ambas partes porque tal testimonio constituye el nervio vital de la cuestión planteada por los apelantes al efecto de que el tribunal de Mayagüez incurrió en error al concluir que la testadora estaba en su cabal juicio al otorgar el testamento, y al darle entera credibilidad al testimonio del doctor Maximiliano Almonte. Se hace preciso, como punto de partida a la resolución de este litigio, el señalar los límites y fronteras de la facultad de revisión de este Tribunal, cuando el fallo del tribunal a quo se ha basado en su dictamen en cuanto al peso, credibilidad y efectividad del testimonio pericial. En el caso de *Wolff* v. *Hernández Usera et al.*, ante pág. 650, indicamos que ha habido expresiones en la jurisprudencia en los Estados Unidos en cuanto al carácter definitivo de un fallo basado exclusivamente en la resolución de un conflicto en las opiniones de peritos. En Puerto Rico la extensión y contornos del poder de este Tribunal para revisar o dejar sin efecto las conclusiones sobre los hechos de un tribunal de primera instancia están definidos y condicionados por la Regla 52 (*a*) de Enjuiciamiento Civil, preceptiva de que las conclusiones de hecho basadas en testimonio oral no se dejarán sin efecto a menos que sean claramente erróneas. La Regla 52 (*a*) es aplicable a conclusiones de hecho basa-

das en la apreciación y consideración de las opiniones de peritos. *Graver Tank & Mfg. Co. Inc.*, v. *Linde Air Products Co.*, 336 U. S. 271, 274, 275; 339 U. S. 605, 611; *Hazeltine Research* v. *Admiral Corp.*, 183 F.2d 953; *O'Brien* v. *O'Brien*, (1953) 202 F.2d 254, 256; *Iriarte* v. *United States*, 157 F.2d 105, Primer Circuito, relativo a conflictos en las opiniones de peritos en cuanto al valor de propiedades. El requisito de que se demuestre claramente el error es especialmente aplicable a casos que envuelven el testimonio de expertos, con su familiaridad con problemas y principios científicos específicos, que no caen dentro del conocimiento y experiencia general. *Graver Co.* v. *Linde Co.*, supra. Para dejar sin efecto unas conclusiones de hecho relacionadas con testimonio pericial, debe demostrarse que se ha incurrido en un error obvio y excepcional. *Graver Co.* v. *Linde Co.*, supra. Debe demostrarse que se ha incurrido claramente en error al juzgar las opiniones de expertos o peritos. *Jeoffroy Mfg. Co.* v. *Graham*, (1953) 206 F.2d 772; *Porter-Cable Machine Co.* v. *Knives and Saws Inc.*, 204 F.2d 21, 23, 24; *Mach. Co.* v. *General Motors Corp.*, (1953) 207 F.2d 42, 45: "No es función del tribunal en apelación, y sí de la Corte de Distrito el determinar el valor probatorio del testimonio de expertos". Para que se pueda demostrar que el error es claramente erróneo, el tribunal de apelaciones debe haber formado la convicción firme y definitiva de que el tribunal sentenciador se ha equivocado. *United States* v. *Oregon State Medical Society*, 343 U. S. 326; *United States* v. *Gypsum Co.*, 333 U. S. 364. La conclusión sería claramente errónea si fuese contraria al peso claro de la prueba (*United States* v. *State Street Trust Co.*, Primer Circuito, 124 F.2d 948; *Fleming* v. *Palmer*, 123 F.2d 749) y solamente debería ser dejada sin efecto si no está sostenida por evidencia substancial. *Corbett* v. *Halliwell*, 123 F.2d 331. Especialmente cuando se trata de la resolución de un conflicto en las opiniones de expertos, debe respetarse el criterio del tribunal a quo, y adoptarse la opinión favorecida por el tribunal sentenciador, a menos que esa

opinión carezca de una base racional, (*Shapiro* v. *Rubens,* 166 F.2d 659) o no sea inherentemente plausible. En un caso como el de autos, este Tribunal no solamente no ha observado a la persona cuya capacidad está en controversia, sino que no ha observado a los peritos que, a su vez, han observado directamente a esa persona. Una parte o factor de gran relevancia en la decisión formulada por un tribunal de primera instancia en cuanto a conflictos en opiniones periciales, lo es no solamente la eficacia científica de la opinión en sí, sino el impacto en el juzgador de la sinceridad, poder presuasivo y personalidad del experto. Esos elementos intangibles no pueden ser captados adecuadamente por el tribunal de apelaciones.

▪ En España ya se ha resuelto por el Tribunal Supremo que la cuestión relativa a la capacidad mental de un testador es una cuestión de hecho a ser resuelta primordialmente por el tribunal de primera instancia, siendo función preeminente del tribunal a quo el aquilatar y evaluar las opiniones de los peritos sobre tal extremo. Sentencias del Tribunal Supremo de España de 10 de abril de 1944; 12 de enero de 1927; 8 de mayo de 1909 y 18 de mayo de 1933. Véase además, Castán, Derecho Civil Español, tomo 4, pág. 264, 6ta. ed. rev.; Scaevola, tomo 12, pág. 106, 2da. ed.

En el caso de autos no se nos ha demostrado que el tribunal sentenciador haya incurrido claramente en error al concluir que la testadora estaba en su cabal juicio al otorgar el testamento. No tenemos la firme convicción de que el tribunal de Mayagüez se haya equivocado; su dictamen no está desprovisto de base substancial en la prueba y no es contrario al peso claro de la prueba. Las opiniones del doctor Almonte tienen una base racional y no carecen, inherentemente, de verosimilitud.

▪ La dimensión de nuestra facultad de revisión se mide y se define por una presunción favorable a la corrección de las conclusiones de hecho formuladas por el tribunal sentenciador. Esa presunción no ha sido rebatida. Existen, ade-

más, otras consideraciones que justifican el fallo apelado. La capacidad de un testador debe apreciarse por su estado al tiempo de otorgar el testamento. Art. 615 del Código Civil; *Ortiz* v. *Bermúdez*, supra. Precisamente el testimonio del doctor Almonte se basa precisamente en su observación de la testadora en el mismo momento de otorgarse el testamento. Además, en el testamento en sí, tanto el notario autorizante como los testigos, incluyendo a un facultativo, certifican que la testadora estaba en su cabal juicio al otorgar el testamento. Tales aseveraciones contenidas en el testamento dan lugar a la presunción de capacidad mental de la testadora, cuya presunción tenía que ser rebatida con pruebas muy cumplidas y convincentes. Sentencia del Tribunal Supremo de España de 10 de abril de 1944; Scaevola, ob. cit., pág. 108; Castán, ob. cit., pág. 266, citando la Sentencia del Tribunal Supremo de España del 29 de diciembre de 1927; Manresa, tomo 5, pág. 360, 6ta. ed. corregida y aumentada.

 Adoptamos y hacemos nuestras las doctrinas establecidas por el Tribunal Supremo de España, del 10 de abril de 1944, actuando como ponente don José Castán Tobeñas, en la forma siguiente:

"Considerando que en recta aplicación de las normas contenidas en los arts. 662, 663, 666 y 695, en su apartado último, todos del Código Civil, la jurisprudencia de esta Sala tiene proclamado: *a)* Que la capacidad mental del testador se presume mientras no se destruya por una prueba concluyente en contrario. *b)* Que la apreciación de esa capacidad ha de ser hecha con referencia al momento mismo del otorgamiento del acto testamentario. *c)* Que aunque la afirmación hecha por el Notario de la capacidad del testador puede ser destruída por ulteriores pruebas demostrativas de que en el acto del testamento no se halla el otorgante en su cabal juicio, requiérese que dichas pruebas sean muy cumplidas y convincentes, ya que la aseveración notarial de que se trata reviste especial relevancia de certidumbre. *d)* Que por ser cuestión de hecho la relativa a la sanidad de juicio del testador, su apreciación corresponde a las Salas de instancia."

 Prevalece generalmente la presunción de sanidad mental, y tal presunción es aplicable a la capacidad de un testador. Manresa, ob. cit., pág. 351, 360; Sentencias del Tribunal Supremo de España del 20 de mayo de 1911: "debe comprobarse lo contrario de modo evidente."; 18 de abril de 1916; 16 de noviembre de 1918; 30 de abril de 1920; 8 de mayo de 1922: "la integridad mental en orden del derecho de testar es una presunción *juris tantum*, que sólo puede destruirse por una prueba evidente y completa en contrario"; 7 de diciembre de 1927 y 25 de octubre de 1928.

 Se podría alegar que la presunción de capacidad mental quedó rebatida en este caso por el testimonio del doctor Guardiola, al efecto de que la testadora padecía de demencia senil. Tal como se indica en una anotación en 168 A.L.R. 991, el peso de la prueba que recae sobre el que impugna la validez de un testamento, de establecer la incapacidad mental, no se sostiene a través de prueba de incapacidad en una época anterior o posterior, de naturaleza temporal, intermitente u ocasional, pero sí se sostiene a través de prueba de incapacidad mental de carácter habitual, continuo o crónico. Aun suponiendo que, como cuestión técnica, la prueba sobre senilidad haya dejado sin efecto la presunción de capacidad, como tal presunción, sin embargo, el tribunal a quo concluyó que, como cuestión de hecho, y aun en ausencia de presunción alguna, y aun suponiendo que la testadora hubiese empezado a padecer anteriormente de senilidad, al otorgarse el testamento ella estaba en su cabal juicio. La demencia senil no es incompatible con la capacidad mental en alguna etapa del desarrollo de la enfermedad. Tal dolencia es generalmente producida por la edad, por la marcha inexorable del tiempo, que tiende a degenerar físicamente el organismo. Aunque la demencia senil es progresiva, ella produce incapacidad mental en ciertas etapas avanzadas de la enfermedad, pero en las etapas intermedias, como veremos más adelante, puede concurrir una adecuada capacidad mental. En este caso, el doctor Guardiola indicó que la testadora

ya estaba en una etapa bastante avanzada de senilidad. Pero el tribunal a quo prefirió aceptar la opinión del doctor Almonte al efecto de que, al otorgarse el testamento, ella estaba en una etapa de adecuada capacidad mental. No encontramos base en los autos para dejar sin efecto esa conclusión del tribunal a quo.

██ La edad avanzada es una circunstancia insuficiente para demostrar incapacidad mental. Castán, ob. cit., pág. 266; Manresa, ob. cit., pág. 358. El Tribunal Supremo de España, en su Sentencia del 25 de octubre de 1928, tomo 185, Jurisprudencia Civil 532, 545, se resuelve que no puede anularse un testamento por el estado senil del otorgante, ya que ni el derecho ni la medicina consienten que por el solo hecho de llegar a la senilidad, equivalente a senectud o ancianidad, se haya de considerar demente al individuo, y ya que la senectud constituye un estado fisiológico en la mayoría de los casos, y la demencia es un estado específico y patológico, no siendo la senilidad un padecimiento que afecte el estado mental con eficacia suficiente para constituir entes privados de razón. Véase, además, Scaevola, ob. cit., pág. 109.

La opinión del Tribunal Supremo de Iowa, en el caso de *Gates* v. *Cole*, 115 N.W. 236, contiene una discusión cabal de la demencia senil de una testadora de más de 75 años de edad, como base alegada de nulidad de un testamento. Se dice lo siguiente:

"Sobre la cuestión de la capacidad mental de la testadora cuando ella hizo el testamento, a primera vista el caso presenta una cuestión más difícil; pero después de un análisis cuidadoso de la prueba no creemos que realmente sea difícil. Es la contención de los apelados que la prueba demuestra que la testadora padecía de demencia senil a través de un período de varios años antes de otorgarse el testamento y, a menos que la prueba sostenga tal contención, no hay base para una conclusión de demencia senil al tiempo de otorgarse el testamento, porque todo el testimonio de los apelados se refiere a la condición de la testadora algún tiempo antes de hacerse el testamento. Antes que discutamos la prueba sobre la cual descansan los apelados, sería conveniente el comprobar qué es la demencia

senil, realmente. Los que han escrito sobre la materia admiten libremente que tal enfermedad difiere grandemente, tanto en su proceso como en el progreso de la degeneración. Los observadores médicos dicen que la enfermedad no puede describirse con caracteres positivos; que en su avance paulatino a la incapacidad, ella incluye una amplia esfera de grados de dolencia, que varía desde un sencillo lapso de la memoria a una completa inhabilidad para reconocer personas o cosas; 'que frecuentemente la dolencia mental de los ancianos no es tan seria como se puede suponer a primera vista y que, para usar un símil, la mente puede estar superficialmente podrida y al mismo tiempo ser básicamente sólida'. Se dice generalmente que uno de los símbolos más seguros de la degeneración mental es la pérdida de la memoria, especialmente en cuanto a nombres y fechas, pero se reconoce plenamente por las autoridades que, aunque una persona vieja puede aparecer como desmemoriada en cuanto a tales cuestiones, su agarre o comprensión mental en cuanto a sus relaciones con los demás, y especialmente con los miembros inmediatos de su familia y con otros que puedan ser objeto de su munificencia, y de sus propios intereses y asuntos, puede demostrar que su capacidad y su entendimiento pueden permanecer firmes. El fallo de la memoria no es suficiente de por sí para crear incapacidad testamentaria, a menos que se extienda tanto que sea inconsistente con la 'mente y memoria sólida' que se requiere en todos los testamentos. 'La edad avanzada, por sí sola, no constituye inhabilitación testamentaria' y 'no hay presunción alguna contra un testamento hecho por una persona de edad avanzada ni se puede inferir la incapacidad de una condición debilitada de la mente y del cuerpo'. *Horn* v. *Pullman,* 72 N.Y. 269. La ley sabiamente sostiene la validez de testamentos hechos por personas cuyos poderes mentales y físicos están deteriorados, siempre y cuando aparezca que el testamento es el acto no influenciado del testador, y que él tiene la inteligencia requerida para comprender la condición y extensión de sus bienes, y para recordar las personas que ordinariamente serían sus beneficiarios. En *Banks* v. *Goodfellow,* L.R. 5 Q.B. 549, el Juez Presidente Cochburn resolvió que, aunque el poder mental de los ancianos esté reducido a menos del nivel general, sin embargo, si el acto testamentario es comprendido y apreciado en sus distintos aspectos, si las facultades mentales retienen suficiente fortaleza para que se comprenda la transacción, existe entonces el poder para hacer un testamento. En otras

palabras, para que exista la demencia senil debe haber tal fallo de la mente que prive al testador de su acción inteligente. Esa es la regla adoptada en nuestros casos y es la regla establecida por el gran peso de las autoridades. El peso de probar tal falta de sanidad, general y establecida, recae sobre . . . los impugnadores. Pero una vez tal condición se establece, surge la presunción de su continuación . . . Hemos expuesto la esencia o el lenguaje de prácticamente todo el testimonio sobre el cual descansan los impugnadores para establecer la demencia senil, y la consiguiente incapacidad. Es muy notable que no aparece de ese testimonio que la Sra. Cole había olvidado sus parientes o amigos, o había dejado de reconocerlos. Ni se ha demostrado que ella no se percataba de sus derechos de propiedad e intereses . . . Si la incapacidad mental se infiriese de tal testimonio ninguna persona que hubiese pasado el meridiano de su vida podría hacer una disposición testamentaria de sus bienes."

En el caso de *In re Denison's Estate*, 162 P.2d 244, 251, se adopta y se ratifica la doctrina sentada en *Gates* v. *Cole*, supra, y se resuelve que la demencia senil no produce, necesariamente, incapacidad mental para testar, indicándose que la enfermedad es progresiva, y debe determinarse si su progreso ha deteriorado tanto las facultades del testador que ellas caen debajo del nivel de capacidad mental, debiendo determinarse ello, no solamente a base de la naturaleza y tendencia de la enfermedad, pero a base de su efecto en cada caso particular. Citando de *Wisner* v. *Chandler*, 147 Pac. 849, 852, se indica que el hecho de que se haya observado algunos síntomas de demencia senil, no implica, de por sí, la ausencia de capacidad testamentaria.

En el caso de *Gilmer* v. *Brown*, 44 S.E.2d 16, 19, se resuelve que la debilidad o deterioro mental, de por sí, no implican incapacidad mental para testar, siendo la cuestión de capacidad una de hecho. Se indica que, en cuanto a la demencia senil, es difícil determinar precisamente el punto en que el progreso de la enfermedad en que las facultades mentales se han deteriorado tanto que ellas caen bajo el nivel de la capacidad requerida. Esto es, aun suponiendo la existencia de demencia senil, puede haber etapas en el progreso

de la enfermedad en que la persona tenga suficiente capacidad mental. (Al mismo efecto, sobre demencia senil, véanse, *In re Tortstensen's Estate*, 184 P.2d 255, en donde se indica, además, que la cuestión del efecto sobre la mente de la demencia es una cuestión de hecho a ser determinada por los médicos; *Byrne* v. *Fulkerson*, 162 S.W. 171, 178, al efecto de que es difícil determinar las fronteras de la demencia senil, existiendo puntos de capacidad y etapas finales de incapacidad; *Hibbard* v. *Baker*, 104 N.W. 399, 400, al efecto de que no se puede establecer un criterio absoluto en cuanto al efecto de la demencia senil en un momento dado y el caso de *In re Koll's Estate*, 206 N.W. 40, en que se resuelve que, para que exista demencia senil en su sentido legal, ella debe afectar la mente del testador en tal forma que él quede privado de su facultad de actuar en forma inteligente, no siendo la edad avanzada suficiente, de por sí, para demostrar incapacidad testamentaria.)

▆▆▆ El art. 612 de nuestro Código Civil dispone, en parte, que estará incapacitado para testar el que, habitual o accidentalmente, no se hallare en su cabal juicio. Se podría argumentar que la expresión "cabal juicio" requiere un intelecto libre de todo defecto o dolencia, y que una persona con algún grado de demencia senil no estaría en su cabal juicio. Es indudable que, en su proceso de interpretación de una disposición referente a capacidad mental, los tribunales deben prestar debida consideración al progreso en la ciencia médica, en cuanto a las múltiples ramificaciones y aspectos de la insanidad o de las anormalidades mentales. Manresa, ob. cit., pág. 357. Scaevola (ob. cit., pág. 90), indica que "según los descubrimientos y progresos que hoy revela la ciencia médico-legal y la mayor e indudable influencia que el derecho recibe de todas las ramas del saber, pòr extrañas que le parezcan . . . tan interesante y trascendental problema no puede en el día tratarse con la estrechez de horizontes y criterio elemental con que en otras épocas los mismos antropólogos y legistas lo estudiaban". No obstante ello, no debemos impri-

mirle a la expresión "cabal juicio" una interpretación tan exacta que destruya la testamentifacción y que anule un testamento en virtud de cualquier imperfección o deterioro intelectual. Presumiéndose la sanidad, debe llegarse a la conclusión de que una persona no está en su cabal juicio si la integridad de sus facultades intelectuales ha quedado menoscabada hasta el punto de que la persona no tiene conciencia de sus actos, y si la perturbación mental real y positivamente ha impedido o mermado la lucidez de la inteligencia con eficacia bastante para constituir a la persona en un ente privado de razón. Manresa, ob. cit., pág. 360, 361; Scaevola, ob. cit., pág. 91, " 'cabal juicio' debe identificarse con 'locura', si bien dando a esta última palabra todo el valor técnico y comprensión genérica de que antes hemos hablado"; Castán, ob. cit., pág. 265: "la enfermedad debe ser grave, hasta el extremo de excluir en quien la padezca la conciencia de los propios actos".

En vista de lo anteriormente expuesto, no incurrió en error el tribunal de Mayagüez al resolver que la testadora estaba en su cabal juicio al otorgar el testamento.

Alegan los apelantes que el testamento es nulo porque no se observaron los requisitos del art. 614 del Código Civil, que determina lo siguiente:

"Art. 614.—Siempre que el demente pretenda hacer testamento en un intervalo lúcido, designará el notario dos facultativos que previamente le reconozcan, y no lo otorgará sino cuando éstos respondan de su capacidad, debiendo dar fe de su dictamen en el testamento, que suscribirán los facultativos además de los testigos."

En este caso no se siguieron los trámites del art. 614. Pero ello no era necesario, ya que dicho art. 614 es solamente aplicable y operante cuando el testamento sea otorgado por un demente, reconocido judicialmente como tal. Debe observarse que el art. 614 habla de un demente, en contraste con lo dispuesto en el art. 611, que señala la incapacidad de una persona que no esté en su cabal juicio. El art. 614 se refiere

a una situación excepcional, a un caso de excepción, en que a una persona real y objetivamente demente se le reconoce la facultad de testar en sus intervalos lúcidos, mediante el resguardo de la observación de dos facultativos. El art. 614 entra en juego cuando ya se ha rebatido clara y objetivamente la presunción de sanidad. Siendo un caso de excepción, su aplicabilidad debe limitarse a aquellas situaciones en que la demencia ha sido reconocida judicialmente. De no existir tal declaración judicial, sería aplicable entonces el art. 634, que dispone, en parte, que "también procurarán el notario y los testigos asegurarse de que, a su juicio, tiene el testador la capacidad legal necesaria para testar".

En su Sentencia del 10 de junio de 1897 el Tribunal Supremo de España resolvió que es claro que este art. (614 nuestro) se refiere al demente reconocido como tal y, por tanto, que si una persona no está reconocida como incapaz, es innecesario el que concurran al testamento dos facultativos que justifiquen que el testador obró en un intervalo lúcido. Lo mismo se resolvió en la Sentencia del 25 de octubre de 1901, en que se indica que no se da el caso previsto en el artículo (614 nuestro) si no está judicialmente declarada la incapacidad mental de una persona, no pudiendo entonces constituirla en estado permanente de demencia, en vista especialmente de que tal artículo impone al notario, por vía de excepción a la regla general, la observancia de una formalidad especial.

En 5 Manresa 386, 6ta. ed. corregida, se dice lo siguiente:

"Por desgracia, ocurre con frecuencia relativa el caso de ser realmente e incapaz una persona, sin que se declare judicialmente esa incapacidad hasta mucho después. La ley, en los arts. 663 al 666, se refiere al estado real de capacidad o incapacidad en que se halla el testador en el momento de testar; pero no puede desconocerse la influencia que ha de ejercer en los efectos probables de ese acto, la circunstancia de hallarse o no declarada previamente la incapacidad, porque es lo cierto que mientras no conste tal declaración, la ley naturalmente presume que se trata de una persona capaz, y así ha de entenderse mien-

tras no se pruebe cumplidamente lo contrario, en tanto que después de declarada la incapacidad, ésta es la que se presume, mientras otra cosa no se pruebe.

"Por esto, para cumplir lo dispuesto en el art. 665, no deben atenerse el Notario y testigos al hecho de hallarse o no declarada la incapacidad. Del estado de las facultades mentales del testador deben cerciorarse siempre, y cuando particularmente les conste o tengan noticia de que se trata de una persona cuya inteligencia se encuentre de ordinario perturbada, o cuando aun sin tal conocimiento previo, observen en el momento de tratar de otorgarse el acto de última voluntad, que el testador no parece hallarse en completo estado de lucidez, deben exigir el reconocimiento por dos facultativos, cumpliendo el precepto de dicho art. 665, que si ha de ser eficaz aun después de declarada la incapacidad de una persona, con mayor razón lo será en el caso de que tal incapacidad no se halle declarada aún.

"Esta doctrina que nos parece racional, resulta contradicha por una Sentencia del Tribunal Supremo dictada en 25 de octubre de 1901, en la que se establece, que no estando declarada la incapacidad de una persona en el momento de otorgar su última disposición testamentaria, no procede la observancia de lo preceptuado en el art. 665. Pueden, no obstante, conciliarse la doctrina establecida en esta sentencia con la que acabamos de defender, en el sentido de que cuando al Notario autorizante del testamento no le consta el estado de incapacidad del testador, por no haber precedido la declaración de ser incapaz, y por no tener motivo alguno para dudar siquiera de la integridad de sus facultades, no existe razón alguna que le obligue a cumplir las formalidades prevenidas en el citado artículo."

Puede inferirse el criterio de Manresa de que si el notario tiene motivo alguno para dudar siquiera de la integridad de las facultades del testador, él debe cumplir con las formalidades del art. 614. Pero tal consideración ofrece una base muy indefinida, inestable, intangible y especulativa para que se requiera la actuación de dos facultativos. De aceptarse tal criterio, la tendencia sería a exigir la presencia de los facultativos en la mayoría de los casos, para evitar el riesgo de que se declare nulo el testamento. Ello complicaría indebidamente el proceso de testar. Es preferible la norma de que se cumplan los requisitos del art. 614 solamente cuando

concurre la base objetiva y tangible de una previa declaración judicial de incapacidad. Aun suponiendo, sin que así lo resolvamos, que el art. 614 pueda ser aplicable cuando la demencia permanente del testador sea pública, notoria e indubitada, sin declaración judicial, esa circunstancia no concurre en el caso de autos. Por lo demás, en este caso se inició un procedimiento de incapacidad mental, que quedó sin terminar. El hecho de que se inicie tal procedimiento no implica, de por sí, que el testador esté incapacitado al otorgar el testamento. Manresa, ob. cit., pág. 387, y véase la Sentencia del Tribunal Supremo de España del 25 de octubre de 1901.

En 12 Scaevola 117, segunda ed., se dice lo siguiente:

"Con respecto al 665 es sumamente transcendente la doctrina contenida en las sentencias de 25 de octubre de 1901 y 22 de enero de 1913, que estiman: lo dispuesto en tal precepto es sólo de aplicación al supuesto de que el testador esté declarado incapaz judicialmente, pues en otro caso el precepto aplicable es el 685. La orientación dada por lo tanto al artículo a que nos referimos implica cierta supeditación al aspecto que pudiéramos llamar formal, de manera que mientras judicialmente no se haya dicho que quien después hace uso de la facultad de testar está incapacitado, no es preceptiva la observancia de las particulares formalidades que este precepto fija, lo que viene a demostrar que el mismo constituye el remedio legal oportuno para compaginar los efectos generales de la declaración con la posibilidad del incapacitado para disponer su última voluntad dentro del intervalo lúcido que viene a reconocer la misma disposición. No obstante, entendemos que, a pesar de que formalmente no se haya declarado la enajenación mental cuando de hecho exista, será convenientísimo, y prácticamente como si la ley lo exigiera debe observarse, requerir el dictamen facultativo con las mismas solemnidades que si la incapacidad estuviere judicialmente pronunciada. De otro modo, ante la impugnación que en su día pudiere hacerse del testamento, si se demuestra la enfermedad mental que el causante padecía, será sumamente difícil a los interesados acreditar la realidad del intervalo lúcido, apreciación muy aventurada en los profanos, quienes difícilmente pueden asegurar la certeza de su parecer al efecto, en todo caso necesitado de la garantía que la apreciación facultativa lleva consigo."

Naturalmente, el hecho de que, como norma de orientación a los notarios, sea conveniente y práctico el que participen dos facultativos cuando existe la probabilidad de demencia, sin que haya mediado una declaración judicial, no significa el que el testamento sea nulo. Una cosa es la conveniencia, y otra cosa es la necesidad jurídica para evitar la nulidad.

No hubo prueba adecuada de clase alguna en este caso de que el testamento hubiese sido otorgado con violencia, dolo o fraude.

*Debe confirmarse la sentencia apelada.*

El Juez Asociado Sr. Sifre no intervino.