# 97 DTA 139

**TRIBUNAL DE CIRCUITO DE APELACIONES**
**CIRCUITO REGIONAL VI DE CAGUAS, HUMACAO Y GUAYAMA**

MAXIMO RAFAEL SOTOMAYOR MAYMI
Demandante-Apelante

v.

JOSE PORFIRIO HERNANDEZ SOTOMAYOR;
EDWIN HERNANDEZ SOTOMAYOR
Demandados-Apelados

v.

CANDIDA HERMINIA SOTOMAYOR FLORES
Demandada Formal y/o Involuntaria

FE SOTOMAYOR MAYMI
Interventora-Apelada

Núm. KLAN-96-00615

San Juan, Puerto Rico, a 11 de junio de 1997

Panel integrado por su Presidente, Juez Rossy García
y los Juez González Román y Ortiz Carrión

Rossy García, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

El recurso. instado en el caso de epígrafe interesa la revocación de una sentencia emitida por el Tribunal de Primera Instancia, Sala Superior de Caguas (Héctor Cordero Vázquez, J.), copia de cuya notificación fue archivada en autos el 30 de abril de 1996. Mediante ésta dicho foro desestimó la demanda instada por el demandante-apelante, Sr. Máximo R. Sotomayor Maymí, quien pretendió obtener un pronunciamiento judicial declaratorio de la nulidad del testamento otorgado a la señora Cándida Herminia Sotomayor Flores. Al dictaminar fundamentó su decisión en que, toda vez que *"la testadora en nuestro caso no ha fallecido... procede en derecho declarar la nulidad del testamento de alguien que puede por sí misma revocarlo o ratificarlo en cualquier momento futuro"*. ■ Inconforme con dicho dictamen y luego de serle denegada una moción de reconsideración al ratificarse el foro de instancia en que *"no nos ha convencido de que no proceda la desestimación de su causa por prematura"*, ■ el aquí recurrente interpuso el recurso que nos ocupa. En el mismo imputa, como único señalamiento de error, que incidió *"el Honorable Tribunal de Instancia Apelado al determinar que la acción judicial interpuesta era prematura y al optar por no intervenir en la controversia planteada"*. ■

Debemos aquí de entrada señalar que el recurso que nos ocupa fue radicado y tramitado según fue titulado, es decir, como apelación. Surge, no obstante, de los autos, que los recurridos interpusieron reconvención contra el aquí recurrente en relación con la cual nada dispuso el foro recurrido. ■ Se trata, pues, de un dictamen parcial, ello toda vez que no adjudica todas las reclamaciones, los derechos y las obligaciones de todas las partes en el pleito, *Cárdenas Maxán v. Rodríguez,* 119 D.P.R. 642, (1987). Además, y ante la realidad de que tenía el foro de instancia ante su consideración reclamaciones múltiples, ello a la luz de lo alegado y expuesto en la reconvención instada, venía obligado, de interesar dictar sentencia final en cuanto a la acción instada por el demandante-recurrente, a consignar la conclusión y orden expresa de finalidad requerida por la Regla 43.5 de Procedimiento Civil, lo que no hizo. En ausencia de la referida conclusión y certificación requerida la sentencia no es final, por lo que no es revisable por apelación. Regla 43.1 de Procedimiento Civil, 32 L.P.R.A. Ap. III. Ello, sin embargo, no es impedimento para considerar el mismo como *certiorari* a los fines de dar curso a la revisión judicial del dictamen recurrido, como cualquier otra resolución interlocutoria. Así, y como tal, habremos de acogerlo.

Considerado ahora el recurso interpuesto propiamente como *certiorari*, resolvemos que resulta procedente expedir el auto solicitado para emitir sentencia confirmatoria del dictamen recurrido.

## I

Los hechos pertinentes al punto de derecho a que se contrae el recurso que nos· ocupa no están en controversia. Según surge de los autos, la señora Cándida Herminia Sotomayor Flores (doña Cándida), quien no ha fallecido, otorgó testamento abierto en la ciudad de Caguas, Puerto Rico, ██ el día 24 de enero de 1991, mediante la Escritura Núm. 3, autorizada por la notario Gloria Mimoso Raspaldo. A la fecha del otorgamiento del testamento que es objeto de impugnación contaba con ochenta y cuatro (84) años de edad.

De las cláusulas pertinentes del referido documento aparece que doña Cándida, soltera por viudez al momento de otorgar su presunta última voluntad, no tenía herederos forzosos. Pudiendo así disponer a voluntad de su caudal, nombró en su testamento como únicos y universales herederos de todos sus bienes a los aquí demandados-recurridos, José Porfirio Hernández Sotomayor y Edwin Hernández Sotomayor, hermanos entre sí e hijos de su sobrina Fe Sotomayor Maymí. ██

Con estos antecedentes, el 3 de octubre de 1995 el recurrente, Sr. Máximo Rafael Sotomayor Maymí (Sr. Sotomayor), interpuso demanda contra los aquí recurridos alegando, en síntesis, que en el otorgamiento del referido testamento había mediado una actuación *"engañosa, dolosa y contraria a todo principio elemental de derecho [por parte de los recurridos que] perseguía privar al recurrente de sus eventuales derechos hereditarios"* y que por razón de la alegada *"condición de demensia [sic] senil"* de la testadora, ésta no podría impugnar la legitimidad del trámite habido. En su virtud, adujo que él era *"sobrino de la demandada formal y/o [sic] involuntaria Cándida Herminia Sotomayor Flores, en cuyo beneficio y protección...interpon[ía] la presente acción judicial"*. ██ Como remedio solicitó un pronunciamiento del tribunal *"declar[ando] la nulidad del testamento otorgado..."*. ██

Emplazados como fueron, los recurridos presentaron su contestación a la demanda. En la misma negaron las alegaciones básicas de la demanda y levantaron entre otras defensas afirmativas, que *"la demanda tal y cómo [sic] está redactada no aduce hechos suficientes para la concesión del remedio que solicita"*. [9] En iguales términos se expresó la interventora, Sra. Fe Sotomayor Maymí (doña Fe), hermana del recurrente, quien, además, solicitó la desestimación de la demanda. ██

En esta etapa de los procedimientos y luego de replicar el recurrente a las mociones en solicitud de desestimación, y presentar otra en solicitud de sentencia sumaria a su favor, el foro de instancia emitió el dictamen ahora recurrido mediante el cual dispuso la desestimación de la demanda, ██ determinación en la que se reiteró al denegar una moción de reconsideración que fue oportunamente presentada por el recurrente.

## II

Toda vez que el recurrente peticionó mediante la acción por él instada un pronunciamiento judicial declarando la nulidad del testamento otorgado por su tía, doña Cándida Herminia Sotomayor Flores, en vida de ésta, nos corresponde determinar si tiene éste legitimación y causa de acción para instar tal acción. Examinaremos luego cuál es el mecanismo a su disposición para preservar la prueba necesaria para, de concretizarse su expectativa de heredar a la testadora, ello de ésta premorirle, instar la acción de nulidad de testamento que estime sea procedente. Para ello habremos de iniciar con un examen de los preceptos jurídicos atinentes al testamento y sus efectos.

Como es sabido, el derecho que rige en nuestra jurisdicción acerca de los testamentos forma parte integral del derecho de sucesiones, el que a su vez se encuentra estatuido en el Libro Tercero del Código Civil de Puerto Rico (en lo sucesivo el Código), 31 L.P.R.A. sec. 1931 *et seq.*, atinente el mismo a los *"Diferentes Modos de Adquirir la Propiedad"*. Al tenor, dispone inicialmente dicho cuerpo jurídico que, en general, *"[l]a propiedad se adquiere por la ocupación [, y que aquélla] y los demás derechos sobre los bienes se adquieren y transmiten por la ley, por donación, por sucesión testada e intestada y por consecuencia de ciertos contratos mediante la tradición [pudiendo] también adquirirse por medio de la prescripción"*. 31 L.P.R.A. sec. 1931.

Atendiendo el modo testado de adquirir la propiedad y, en lo pertinente, luego de considerar quiénes están capacitados para disponer de su propiedad por testamento, el Código enuncia que éste es *"[e]l acto por el cual una persona dispone para después de su muerte de todos sus bienes, o de parte*

*de ellos...*". 31 L.P.R.A. sec. 2121. (Énfasis suplido). El profesor Guaroa Velázquez, acogiendo la definición de Modestino, define el testamento como *"el acto por el cual manifestamos nuestra última voluntad para que ésta sea cumplida después de la muerte"*. A su juicio, esa definición aventaja la del Código Civil porque *"incluye no sólo las transmisiones de bienes sino todas las disposiciones de última voluntad, como reconocimiento de hijo natural, designación de tutor, nombramiento de albacea, revocación de un testamento anterior, etc."* Aquí, contrario a los negocios jurídicos intervivos, basta la expresión de la voluntad de una sola parte, siendo la revocabilidad uno de los atributos esenciales del testamento. Por ello, y como bien se ha expresado, *"mientras el testador es persona, el testamento no es otra cosa que un mero proyecto"*, reconociendo la doctrina que sus efectos se producen a raíz de la muerte del testador; o sea, que la eficacia del testamento demanda el fallecimiento del testador. Luis Roca Sastre Muncunill, *Derecho de sucesiones*, T. I, 2da. ed., Ed. Bosch, Barcelona (1995), pág. 84; Manuel Albaladejo, *Comentarios al Código Civil y Compilaciones Forales*, T. IX, Vol. 1-A, Edersa (1990), págs. 194-195. Vivo el testador, *"no es más que eventual última voluntad"*.

Pasando a considerar ahora las causas de ineficacia del acto testamentario y la legitimidad para plantear las cuestiones de nulidad testamentaria, debemos iniciar por señalar que la revocación, la nulidad y la caducidad son las tres causas que pueden generar tal efecto. En síntesis y como bien señala el Profesor González Tejera,

*"[l]a revocación destruye en todo o en parte, la eficacia del testamento y se produce cuando el testador en forma expresa o implícita comunica su voluntad de deshacer todo o parte de lo hecho en su testamento anterior. La nulidad también destruye la eficacia del testamento, de ordinario en su totalidad, pero contrario a la revocación, que es atribuible a la conducta del testador, la nulidad puede deberse a falta de observancia de las formalidades requeridas para testar, a falta de capacidad del testador o a infracción de normas revestidas de interés público, como la prohibición de los testamentos mancomunados. La caducidad destruye en su totalidad la eficacia del testamento por razón del transcurso del tiempo señalado por el legislador, ya sea para que se produzca el deceso del causante, o para que se realicen las solemnidades complementarias que culminen su eficacia."*

En iguales términos se pronuncia Roca-Sastre al referirse a la nulidad, indicando que se produce cuando en el momento de otorgarse el testamento no hay concurrencia de los requisitos indispensables para su validez, ya sea por carecer el otorgante de capacidad para testar, porque su voluntad esté viciada, por no haberse adoptado el tipo o forma testamentaria adecuada o por la inobservancia de las solemnidades legales. Al tenor, estatuye el Código que *"[s]erá nulo el testamento en cuyo otorgamiento no se hayan observado las formalidades respectivamente establecidas en este capítulo"*, 31 L.P.R.A. sec. 2152, y asimismo lo será aquél *"otorgado con violencia, dolo o fraude"*. 31 L.P.R.A. sec. 2127.

Sobre la revocación y la caducidad, las que considera también como causas de ineficacia, apunta el referido tratadista sobre la primera que la revocación es nota o característica esencial del testamento, lo que enuncia el Código en su Art. 668 al estatuir que *"[t]odas las disposiciones testamentarias son esencialmente revocables"*. 31 L.P.R.A. sec. 2231. Ello sienta las bases para la exposición doctrinal de que, siendo el testamento una expresión de última voluntad y que sólo con la muerte adquiere consistencia jurídica, *"es natural que el testador pueda libremente cambiar su voluntad hasta el último instante de su vida"*. Pastor Ridruejo, *La revocación del testamento*, Barcelona (1964), pág. 17 y ss., según citado por Roca-Sastre, *supra*, pág. 288. Véase, también, Albaladejo, *supra*, pág. 195. Por su parte, la caducidad ocurre en aquellos casos cuando, transcurrido el período de tiempo concedido por el Código para que el testamento conserve su vigor o por no haberse llevado a cabo ciertos actos, queda el testamento automáticamente sin efecto.

De otra parte, y en lo que respecta a la legitimidad activa y pasiva para plantear las cuestiones de nulidad testamentaria, hay uniformidad doctrinal en que tienen capacidad para iniciar una acción judicial --fundada en la nulidad total o parcial de un testamento-- todas aquellas personas naturales o jurídicas que podrían beneficiarse directa o indirectamente con su ineficacia. Ahora bien, vivo el testador, *"nadie tiene capacidad para atacar el testamento, porque nada hay que anular, como ya indicáramos, porque no es impugnable lo que aún no ha nacido, lo que no existe"*. Basta con señalar que, si bien el negocio jurídico que encarna el testamento como tal se perfecciona al momento

de su otorgamiento, éste adquiere virtualidad a raíz de la muerte del testador. Albaladejo, *supra*, pág. 195; Sentencia de 11 de junio de 1953 del Tribunal Supremo de España. En palabras de J.B. Jordano Barea, según recogidas por Albaladejo, ello responde a que en el testamento *"se trata de un acto que no está destinado, a diferencia de los inter vivos, a circular y operar en el tráfico jurídico ordinario, sino a preordenar una determinada regulación de intereses para el tiempo en que el sujeto habrá cesado de vivir; acto, pues, que solo tiene relevancia para la generalidad después de la muerte del sujeto y que impone a los supérstites ex post... "*. Manuel Albaladejo, *supra*, pág. 186. (Enfasis suplido).

Como bien expresa González Tejera, *supra*, a las págs. 267-268, citando la Sentencia del Tribunal Supremo de España de 12 de noviembre de 1964, *"en el testamento coinciden en una sola persona las cualidades de autor del negocio jurídico y de titular de sus consecuencias o efectos, mientras vive, por lo que no se da la situación de conflictos de intereses que incentivan el que se interese revisar los efectos y consecuencias del negocio, como sucede en materia de contratos"*. Es por ello que se reitera en que, vivo el testador, no hay testamento, ello para afirmar, además, refiriéndose al plazo para ejercitar la acción de nulidad de testamento, citando a Puig Brutau, que si hay un testamento aparentemente válido, como en los casos en que se alega algún vicio de la voluntad o una infracción de solemnidad que no destruye al testamento en su forma esencial, la acción para decretar la nulidad no debe tener duración indefinida. Para estos casos la opinión más extendida es que el plazo será el de 15 años a partir del fallecimiento del causante. Mientras vive el testador el plazo no corre. Primero, porque éste tiene a su disposición la posibilidad de revocar el testamento anulable y segundo, porque mientras éste vive no hay testamento; su otorgamiento, como dijéramos anteriormente, es última voluntad eventual, no definitiva. Siendo ello así, no puede empezar el plazo para accionar una causa de acción que aún no ha nacido. Por consiguiente, el plazo inicia su transcurso en el tiempo a partir de la muerte del testador y más específicamente, al siguiente día de su muerte, por analogía de lo dispuesto en el Art. 1869 del Código Civil, [31 L.P.R.A. sec. 5299]. 

Finalmente, y frente a la controversia que hoy nos ocupa, cobra relevancia el art. 624 del Código Civil, 31 L.P.R.A. sec. 2169, que dispone en su apartado 2 que el testador no puede prohibir que se impugne el testamento en los casos en que haya nulidad declarada por la ley. A nuestro juicio, se armonizan de esta forma los intereses en conflicto. De una parte, se protege el carácter rigurosamente personal y revocable del testamento, garantizándole así al testador la libre disposición de sus bienes, quien conserva la facultad de revocar su testamento o de modificarlo hasta el momento mismo de su muerte sin verse expuesto a los gastos e inconvenientes que ocasionan litigios que podrían tornarse académicos. De otra parte, se reconoce la acción de nulidad testamentaria, a partir de la muerte del causante, quedando así, en el proceso, protegida la política pública contra el fraude, evitando que prevalezcan los actos nulos.

Independientemente de lo antes indicado y en perfecta armonía, cobra aplicación, como fundamento desestimatorio, la doctrina sobre legitimación activa. Esta requiere, para tener capacidad para instar una acción, que el promovente de ésta cumpla con los siguientes requisitos indispensables: (1) que ha sufrido un daño claro y palpable; (2) que el daño es real, inmediato y preciso y no uno abstracto o hipotético; (3) que la causa de acción debe surgir bajo el palio de la Constitución o de una ley; y (4) que exista una conexión entre el daño sufrido y la causa de acción ejercitada. *Fundación Arqueológica v. Departamento de la Vivienda*, 109 D.P.R. 387 392 (1980); *Hernández Agosto v. Romero Barceló*, 112 D.P.R. 407, 414 (1982); *Hernández Torres v. Hernández Colón I*, Op. de 31 de enero de 1992, **92 J.T.S. 16**; *Hernández Torres v. Hernández Colón II*, Op. de 16 de septiembre de 1992, **92 J.T.S. 123**; y *Noriega Rodríguez v. Hernández Colón*, Op. de 18 de marzo de 1994, **94 J.T.S. 35.**

Observamos así que en el caso que nos ocupa el demandante-recurrente, lejos de alegar que ha sufrido un daño claro y palpable, real e inmediato, presenta alegaciones sobre un daño que a lo sumo es más abstracto o hipotético que real y preciso y, mucho menos, inmediato. En tales circunstancias nos vemos impedidos de reconocerle legitimación activa al recurrente para promover la acción que fue desestimada mediante la sentencia que es ahora objeto de impugnación.

Atendiendo por último la argumentación del recurrente a los efectos de que *"una acción cuando fallezcan los testigos es un reconocimiento fútil"*, ésta tampoco mejora su posición. Precisamente, para

aquellos casos donde lo que existe es *"[u]na expectativa de que eventualmente habrá un pleito"*, como es la situación particular del caso que nos ocupa, y existen razones para la perpetuación de testimonios, tiene a su disposición el recurrente el mecanismo que le provee la Regla 24.1 de Procedimiento Civil, 32 L.P.R.A. Ap. III, que permite tomar deposiciones antes de iniciarse un pleito. Conforme a ello en ella dispuesto, y distinto a los pleitos civiles ordinarios en que lo que se promueve es una demanda, bajo esta regla lo que se presenta es una petición con debida notificación a las personas que el peticionario espera habrán de ser partes adversas, indicando, entre otros extremos, las razones que tengan para interesar la perpetuación de determinados testimonios, indicando, además, la sustancia del testimonio que espera obtener. Así, y como bien se ha resuelto, constituye dicha regla el vehículo apropiado para perpetuar un testimonio en contemplación a la iniciación de un pleito, presente la condición de que exista peligro de que el testimonio no esté disponible por el tiempo necesario. José A. Cuevas Segarra, *Práctica Procesal Puertorriqueña*, Vol. II, *Procedimiento Civil*, 1979, Análisis Editorial, **Publicaciones J.T.S.**, págs. 134-135. También se ha reconocido que resulta permisible utilizar dicha regla incidentalmente y a manera de excepción para el descubrimiento de prueba, pero siempre debe darse la condición de que exista el peligro de que el testimonio no esté disponible por el tiempo necesario y deba, en consecuencia, perpetuarse. *Radio Noroeste Broadcasting v. Rodríguez*, 113 D.P.R. 304 (1982). Ahora bien, indicado lo antes expuesto debemos dejar claro que dicha regla no fue diseñada principalmente para descubrir bases en qué apoyar un pleito futuro o para completar la información para tal propósito. *Id.*

Disponible dicho instrumento procesal, queda en manos del recurrente tomar aquellas medidas cautelares en contemplación al momento en que se le reconozca legitimación para atacar el testamento que hoy está imposibilitado de impugnar. Como bien se indica en el inciso (d) de la Regla 24.1, *"[s]i una deposición para perpetuar testimonio fuera tomada de acuerdo con estas reglas, o aunque no hubiese sido así tomada, fuere admisible en evidencia en los tribunales de la jurisdicción en que fue tomada, podrá ser usada en cualquier pleito incoado posteriormente que envuelva el mismo asunto, con arreglo a la Regla 29.1"*. Esta última disposición reglamenta en términos generales el uso de las deposiciones.

Para concluir, tampoco le asiste la razón al recurrente al argumentar que su acción debe ser acogida al amparo de lo dispuesto en la Regla 59.1 de Procedimiento Civil, la cual regula las sentencias declaratorias. Si bien dicha regla provee que el Tribunal de Primera Instancia tendrá autoridad *"para declarar derechos, estados y otras relaciones jurídicas"*, ello está predicado en que el promovente pueda instar la acción, lo que se hace evidente al examinar la Regla 59.2, disposición que aclara quiénes pueden solicitarla. Así, dispone ésta, en lo pertinente, como sigue:

*"(a) [t]oda persona interesada en una escritura, testamento, contrato escrito, u otros documentos constitutivos de contrato, o cuyos derechos, estado u otras relaciones jurídicas fuesen afectados por un estatuto, ordenanza municipal, contrato o franquicia, podrá solicitar una decisión sobre cualquier divergencia en la interpretación o validez de dichos estatutos, ordenanzas, contrato o franquicia, y además que se dicte una declaración de los derechos, estados u otras relaciones jurídicas que de aquellos se deriven. Un contrato podrá ser interpretado antes o después de haber sido infringido.*

*(b) Los albaceas, administradores judiciales fideicomitentes, fideicomisarios, fiduciarios, tutores, acreedores, legatarios, herederos o causahabientes actuando en esas capacidades, o en representación de otras personas interesadas, podrán pedir y obtener una declaración de derechos o de relaciones jurídicas, en todos los casos en que se administren fideicomisos, fundaciones, bienes de difuntos, menores incapacitados o insolventes:*

*(1) Para determinar sobre clases de acreedores, legatarios, herederos, causahabientes u otros; o*

*(2) Para ordenar a los albaceas, administradores o fideicomisarios que ejecuten o se abstengan de ejecutar cualquier acto determinado en su capacidad fiduciaria; o*

*(3) Para determinar sobre cualquier cuestión que surja en la administración de los bienes o del fideicomiso, incluyendo las de interpretación de testamentos y otros documentos."*

Finalmente, dispone su inciso (c) que los incisos (a) y (h) no son taxativos ni limitan o restringen el

ejercicio de las facultades generales conferidas en la Regla 59.1 cuando se solicita un remedio declaratorio, *"siempre que una sentencia o decreto hubiere de poner fin a la controversia o despejar una incertidumbre"*, (énfasis nuestro), concediéndole discreción al tribunal para no acoger·la proposición del recurrente si no está presente este último requisito. Regla 59.3 de Procedimiento Civil, *supra*, R. 59.3.

Varios aspectos interesantes y pertinentes a la controversia de autos se coligen claramente de las reseñadas disposiciones. En primer lugar, el mecanismo procesal de la sentencia declaratoria no quita ni da derechos: las disposiciones de las reglas atinadamente limitan el uso de este vehículo a aquellas personas a las que el derecho sustantivo les reconoce algún interés en las situaciones allí contempladas. Nos resulta obvio que un mecanismo procesal no puede conceder capacidad o legitimación para que una parte pueda instar una acción que de otra forma no existiría. Así, la Regla 59.1 sin ambages concede que este vehículo se podrá utilizar *"aunque se inste o pueda instarse otro remedio"*, por aquellas personas cuyos intereses reconocidos por el derecho sustantivo están contemplados en la Regla 59.2(a). Nada más ni nada menos. En segundo lugar, es manifiesto el objetivo perseguido por la regla de darle virtualidad al interés del Estado de promover la finalidad y el reposo a los litigios judiciales -adjudicándole, asimismo, la debida dignidad a los fallos de los tribunales- cuando estatuye que mediante su uso se debe *"poner fin a la incertidumbre o controversia que originó el procedimiento"*. *Id*. En su virtud, la utilización del *"remedio" de la sentencia declaratoria* está *"contraindicado"* cuando, por alguna razón particular al caso de que se trate, el tribunal interpelado no contempla que la decisión a emitirse resuelva, de manera definitiva, el asunto traído ante su consideración.

Veamos ahora, dentro del marco jurídico antes expuesto, si incidió la sala sentenciadora al desestimar la acción instada *"por prematura"*.

### III

El Sr. Máximo Rafael Sotomayor Maymí, sobrino de la testadora doña Cándida Herminia Sotomayor Flores, compareció ante el foro de instancia para interponer la demanda cuya desestimación dio base al recurso que hoy nos ocupa. Alegó que la misma fue instada para *"beneficio y protección" de dicha testadora. Toda vez que al momento de interponer su acción doña Cándida no había fallecido --y de hecho, no nos consta que otra sea la situación actualmente-- el Sr. Sotomayor fundamentó la misma en que la alegada "condición de demencia senil"* en la que ésta se encontraba no permitía que doña Cándida pudiera impugnar la legitimidad de su testamento cuyo otorgamiento, adujo, fue contrario a todo principio elemental de derecho por estar permeado de *"engaño y dolo"*. No obstante, al imputarle tal conducta a los recurridos (sobrino nietos de la testadora), claramente y sin ambages arguyó que la motivación de éstos al inducir a doña Cándida a testar lo que perseguía era privarlo de *"sus eventuales derechos hereditarios"*. En consecuencia, debido a la relación existente entre las partes, evidente resulta que de prevalecer la acción de nulidad de testamento instada por el Sr. Sotomayor al alegar engaño y dolo, y de ser ciertas las alegaciones sobre la capacidad mental actual de doña Cándida, que implica *"incapacidad habitual"* según los términos del Código --lo que automáticamente la descalificaría como persona idónea para otorgar documento alguno, mucho menos un instrumento público de la solemnidad y formalidad que revisten los testamentos como expresión de última voluntad-- el demandante-recurrente junto a su hermana, la interventora doña Fe, se convertirían en los herederos legítimos de doña Cándida una vez ésta falla en advenir como tales por la línea colateral conforme al quinto orden según dispone nuestro ordenamiento sucesoral vigente.

De entrada, es menester dejar claramente establecido que, en ausencia de prueba en contrario, ▪ partimos de la premisa de que al momento de testar doña Cándida estaba plenamente facultada en derecho para proceder a otorgar el controvertido testamento que se pretende anular. Aclarado este extremo, observamos que al acudir ante el tribunal de instancia por sí, en busca de un pronunciamiento judicial declarando la nulidad del testamento de doña Cándida, el demandante-recurrente hace abstracción total de la exposición doctrinal aquí consignada, a base de la cual nuestro derecho sucesorio no le reconoce legitimación activa a persona alguna, ni aun al testador mismo --en vida de éste-- para invocar la nulidad de un testamento, Efraín González Tejera, *supra*, pág. 287; Luis Roca-Sastre, *supra*, incluyendo aquellas instancias en que se alegan vicios de la voluntad o del consentimiento. Ello es así porque es a raíz de la muerte, momento en que

efectivamente queda reglamentado el destino de los bienes del testador, que se produce una amplia legitimación activa que faculta al que hubiera resultado beneficiado (ya fuera por la verdadera voluntad del causante o porque hubiese advenido heredero *ab intestato*), para actuar en defensa de su interés. ■ Albaladejo, *supra*, págs. 195196. Acorde, mientras ese acontecimiento no ocurra, es fútil hablar de derechos o expectativas adquiridas toda vez que el testador, para que adquieran virtualidad las disposiciones del Código que persiguen que el testamento sea realmente una expresión de su última voluntad, 31 L.P.R.A. sec. 2121, está facultado de pleno derecho para alterarlo o revocarlo hasta el momento mismo de su muerte. Efraín González Tejera, *supra*, pág. 14. Ello se hace más significativo aun en el caso de autos, cuando se observa que doña Cándida, por no tener herederos forzosos y ser soltera por viudez, puede disponer a voluntad de todos sus bienes sin estar atada por ley a las limitaciones que en tales casos se imponen. Art. 692, 31 L.P.R.A. sec. 2281. En consecuencia, dictaminó con corrección el foro de instancia al concluir que *"no procede en derecho declarar la nulidad de un testamento de alguien que puede por sí misma revocarlo o ratificarlo en cualquier momento futuro"*. ■

Para concluir, los fundamentos hasta aquí esbozados son igualmente válidos frente al planteamiento del recurrente de que lo que éste persigue con su demanda es un pronunciamiento del tribunal mediante el mecanismo de la sentencia declaratoria, por lo que igualmente disponen del mismo. Alegando que este estatuto es uno *"creador"* de remedios, al tenor sostiene que *"una parte tiene derecho a solicitar el auxilio judicial cuando se han quebrantado disposiciones de ley que, en ese momento, o en algún momento futuro pueda afectar, menoscabar o privarle de prerrogativas, derechos e intereses...tutelados por ley"*. ■ Aunque en principio esta última aseveración es correcta, la misma no es aplicable a las circunstancias que concurren en el caso de autos. Nos explicamos.

En primer lugar, al pretender encontrar derechos sustantivos en unas disposiciones de derecho procesal, el recurrente obvia el requisito de umbral que debe estar presente para que pueda utilizarse el vehículo de la sentencia declaratoria para lograr los propósitos para lo cual fue adoptado en nuestra jurisdicción, condición que él mismo reconoce que debe existir: un interés o derecho tutelado por ley. Regla 59.1 de Procedimiento Civil, *supra*. (Enfasis suplido). Si bien es cierto que lo que se pretende evitar mediante su utilización es una controversia futura, ello no hace prescindible que deba mediar un interés o derecho reconocido por el ordenamiento aplicable. Como ha quedado consignado previamente, el derecho no le reconoce legitimación alguna a ninguna parte para solicitar la nulidad de un testamento en vida del testador porque no hay un interés o derecho tutelado en ese momento, ante la ineficacia del mismo mientras no medie el fallecimiento del testador.

En segundo lugar, es un hecho incontrovertido que la testadora, doña Cándida, aún vive, y que la *"demencia senil no es incompatible con la capacidad mental en alguna etapa del desarrollo de la enfermedad"*. *Jiménez v. Jiménez, supra*, pág. 733. En su virtud, ello no sería óbice para que ésta revocara o ratificara su última voluntad expresada en el testamento en cuestión, lo que explica la sabiduría de la posición doctrinal que declara que vivo el testador, no hay testamento que pueda ser objeto de impugnación.

## IV

Por los fundamentos antes consignados, resolvemos que resulta procedente expedir el auto interesado para emitir sentencia confirmatoria de la resolución recurrida.

El Juez Ortiz Carrión disiente mediante Opinión escrita.

Lo acuerda y manda el Tribunal y así lo certifica la señora Secretaria General.

Aida Ileana Oquendo Graulau
Secretaria General

**ESCOLIOS 97 DTA 139**

**1.** Véase Sentencia, Apéndice del recurso, pág. 2.

**2.** Véase Resolución y Orden, Apéndice del Recurso, pág. IIA.

**3.** Véase Escrito de Apelación, pág. 9.

**4.** En lo pertinente solicitaron los demandados la designación de un defensor judicial para doña Cándida a los fines de adelantar y promover las causas de acción expuestas en reconvención, a saber:

*"2. Que doña Cándida Herminia Sotomayor Flores a este momento tiene bienes de los cuales únicamente recibe beneficio de la renta de una ferretería por la cantidad de novecientos dólares ($900.00), la cual se utiliza para pagar el asilo, gastos personales y medicinas. Gastos que se cubren en adición con su cheque de seguro social que asciende a ciento noventa y tres dólares ($193.00).*

*3. doña Cándida Herminia Sotomayor Flores es dueña de la mitad de varias fincas sitas en el Barrio Cañaboncito de Caguas, Puerto Rico. Terrenos que están siendo administrados por el demandante don Máximo Rafael Sotomayor Maymí y que se ha venido beneficiando de forma irrazonable e injusta de los mismos.*

*4. Que la mitad de los terrenos pertenecen al demandanate Máximo Rafael Sotomayor Maymí y a su hermana doña Fe Sotomayor Maymí, que por haberlos herededado (sic) de su señor padre don Rafael Sotomayor Flores y el demandante Máximo Rafael Sotomayor Maymí domina no tan sólo su participación de esos terrenos sino la participación de su señora hermana y, además, exceptuando lo antes mencionado todo el resto de bienes que pertenecen a doña Cándida Herminia Sotomayor Flores."*

**5.** Que en dichos terrenos, además de la ferretería mencionada, existen otras fuentes de rentas que de acuerdo a nuestro mejor entender son los siguientes:

*"A. Talleres de mecánica que pagan una renta de setecientos cincuenta dólares ($750.00) mensuales.*

*B. Talleres de hojalatería y pintura que pagan una renta de aproximadamente cuatrocientos dólares ($400.00).*

*C. Segundo taller de mecánica que paga una renta aproximada de cuatrocientos dólares ($400.00).*

*D. Terrenos dedicados a la siembra producen frutos y únicamente enriquecen al demandante Máximo Rafael Sotomayor Maymí.*

*E. Local de panadería que tiene una renta de mil dólares ($1,000.00).*

*F. Y otros que en este momento no podemos detallar.*

*6. Que en vista de que sus propias alegaciones establecen la incapacidad de doña Cándida Herminia Sotomayor Flores esta parte interesa se le nombre un defensor judicial, a doña Cándida Herminia y se le ordene a la parte demandante a rendir un informe e inventario de todos los bienes, rentas, frutos, etc., que ha percibido de las propiedades en que doña Cándida Herminia Sotomayor Flores es la propietaria única y/o en donde tiene una participación en comunidad con el demandante y su hermana Fe Sotomayor Maymí."*

**5.** Véase Escritura Núm. 3, Apéndice del recurso, pág. 72.

**6.** Esta última, Fe Sotomayor Maymí, intervino en el trámite procesal ante el foro de instancia mediante demanda de intervención, a la que medió oposición del demandante-apelante.

**7.** Véase Demanda, Apéndice del recurso, Alegaciones núm. tres (3) y once (11), págs. 12 y 13.

**8.** Véase Demanda, Apéndice del recurso, pág. 14.

**9.** Véase Contestación a la demanda, Apéndice del recurso, págs. 16-19. En dicho escrito los demandados incluyeron, además, una reconvención, a la que no habremos de hacer referencia por innecesario a la luz del aspecto de derecho a que se contrae el recurso que nos ocupa.

**10.** Fundó su reclamo en que en la actualidad era ella la única que se ocupaba de doña Candida, quien se encontraba asilada en el Hogar Jesús Santa María. Alegó, además, que parte de sus bienes se encontraban en común pro indiviso con los bienes de ésta. Véanse la *"Solicitud de Intervención"* y *"Contestación a la Demanda y Solicitud de Intervención",* Apéndice del

recurso, págs. 27-28 y 22-26, respectivamente.

**11.** Constan en el expediente escritos de oposición a la intervención de doña Fe por parte del demandante; de réplica a la oposición; moción en cumplimiento de orden respecto de la moción de desestimación y petición de sentencia sumaria solicitada a favor del demandante.

**12.** Guaroa Velázquez, *Teoría del Derecho Sucesorio Puertorriqueño,* 2da. Ed., Equity, San Juan, 1968, pág. 161.

**13.** *Id.*

**14.** Efraín González Tejera, *Derecho Sucesorio Puertorriqueño,* Vol, II, San Juan, P.R., Ed. 1983, a la pág. 14.

**15.** En esta obra Roca-Sastre nos ofrece una definición de testamento en la que afloran todos sus caracteres, al describir que *"[e]l testamento es un negocio jurídico, unilateral, individual y personalísimo, solemne, no recepticio y esencialmente revocable, por el cual una persona dicta y ordena las normas de su sucesión para después de su muerte".* Luis Roca-Sastre Muncunill, *supra,* pág. 81.

**16.** José Castán Tobeñas, *Derecho Civil Español Común y Foral,* T. IV, Vol. II. 7ma. ed., Madrid (1973), pág. 412.

**17.** Efraín González Tejera, *supra,* a la pág. 239.

**18.** Además de disponer sobre quiénes, en general, están capacitados para testar, Art. 612, 31 L.P.R.A. sec. 2112, los subcapítulos pertinentes del Código contemplan las distintas incapacidades dependiendo de la clase de testamento de que se trate (ológrafo, abierto, cerrado). En cuanto a la capacidad mental para testar --lo que es condición *sine qua non* del testador **al momento de testar,** Art. 615, 31 L.P.R.A. sec. 2115-- en general el Código la presume. Véanse *Jiménez v. Jiménez,* 76 D.P.R. 718 (1954) y *Andino v. Andino,* 83 D.P.R. 138 (1961). Así, varios de sus artículos disponen cuándo será valido el testamento otorgado por un enajenado mental. Arts. 613 y 614, 31 L.P.R.A. secs. 2113 y 2114, respectivamente.

**19.** El Código atiende la revocación y la ineficacia de los testamentos en el Subcapítulo VIII, Arts. 668 al 674, 31 L.P.R.A. secs. 2231-2237, inclusive.

**20.** Así, provee el Código para la caducidad del testamento ológrafo, Art. 639, 31 L.P.R.A. sec. 2163; y de aquéllos abiertos otorgados en peligro inminente de muerte o en casos de epidemia. Arts. 653-654.,31 L.P.R.A. secs. 2190-2191.

**21.** Luis Roca-Sastre Muncunill, *supra,* a la pág. 290, *.Id.,* a la pág. 290.

**22.** Según citada por Roca-Sastre, *supra,* pág. 286, nota al calce núm. 581.

**23.** Aranzadi, Tomo XXX, Vol. II, 1964, núm. 5080, pág. 3078.

**24.** Efraín González Tejera, *supra,* a las págs. 285-286.

**25.** Así, el demandante y la interventora, como sobrinos de doña Cándida, constituyen el tercer grado con relación a doña Cándida. Toda vez que dicha parte no tiene herederos forzosos (línea descendente o ascendiente, primero y segundo orden) ésta puede disponer libremente de sus bienes. 31 L.P.R.A. sec. 2281. El tercer orden serían hermanos, y el cuarto, el cónyuge supérstite, circunstancias que no están presentes en el caso de autos. Así, los sobrinos se encuentran en el quinto orden. De otra parte, el derecho sucesoral provee que en la sucesión intestada los parientes de grado más cercano excluyen a aquellos de grados más remotos, 31 L.P.R.A. sec. 2607, y que estos advienen herederos hasta el sexto grado de parentesco (o sea, en ausencia de otros parientes más cercanos, en el caso de marras, por ejemplo, heredaria hasta el hijo de un sobrino nieto).

**26.** Es menester recalcar que el tribunal apelado dispuso de la demanda instada, mediante desestimación, sin entrar a considerar los méritos de las alegaciones del demandante. Es por ello que aun tomando como buenas las alegaciones sobre la incapacidad mental de doña Cándida, no podemos considerar la prueba aportada al respecto. Al contrario, presumimos la capacidad de la misma, por lo menos en lo que respecta al momento de haber otorgado su testamento. 31 L.P.R.A. sec. 2112; *Jiménez v. Jiménez, supra; Andino v. Andino supra.*

**27.** Como se ha expuesto, González Tejera apunta que el otorgamiento de un testamento es un acto de última voluntad eventual, no definitiva, ya que el testador tiene a su disposición la posibilidad de revocar su testamento. Así, concluye que el

mismo debe comenzar a decursar a la muerte del testador, implicando así que es en ese momento que nace la causa de acción para invocar la nulidad del testamento. Efraín González Tejera, *supra*, pág. 285.

**28.** Véase Sentencia, Apéndice del recurso, pág. 2.

**29.** Véase Escrito de apelación, pág. 8.

## VOTO DISIDENTE DEL JUEZ DE
## APELACIONES SR. ORTIZ CARRION — 97 DTA 139

San Juan, Puerto Rico, a 11 de junio de 1997

Respetuosamente disiento de la sentencia suscrita por la mayoría de los jueces que constituyen este Panel. El Artículo 622 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 2127, establece claramente que un testamento otorgado con violencia, dolo o fraude será nulo. Con ello el Código crea acción de nulidad testamentaria, sin embargo no fija el plazo dentro del cual puede ejercerse, ni establece claramente cuándo surge la causa de acción para impugnar la validez de un testamento o quien pueda ejercerla. Cf. *Arroyo v. Fernández,* 68 D.P.R. 514 (1948); *Quiñones v. Escalera,* 99 D.P.R. 962, 967 (1971).

Tal como indica la elaborada sentencia suscrita por la mayoría de los jueces que constituyen este Panel, la doctrina moderna establece que en vida del testador, el testamento no puede ser impugnado por ninguna otra persona, ya que mientras viva el testador nadie tiene derechos adquiridos sobre las disposiciones de carácter voluntario contenidas en su testamento. Por consiguiente, mientras viva el testador, ninguna otra persona está legitimada para impugnar su testamento, pues el único interés tutelado por el derecho es el del propio causante, que esté facultado para lograr que su testamento contenga su última voluntad. Para ello, tiene capacidad para dejar su testamento sin efecto mediante revocación, cambio o modificación. Por esta razón, por lo general, esta capacidad hace innecesario que se hable de una acción de impugnación por parte del propio testador, ya que el testador tiene la alternativa de dejar su testamento sin efecto, en caso que sea nulo, lo cual constituye una vía más práctica y expedita que la impugnación. José Puig Brutau, *Fundamentos de Derecho Civil,* T. V, Vol. II, 2da. Ed., Barcelona, 1977, pág. 196; Lacruz Berdejo y Sancho Rebullida, *Derecho de Sucesiones,* Vol. I, Barcelona, 1971, pág. 532; Efraín González Tejera, *Derecho Sucesorio Puertorriqueño,* Vol. II, San Juan, 1983, pág. 290.

Sin embargo, algunos tratadistas han planteado acertadamente que cuando el testador está judicialmente incapacitado, y su tutor estimase que éste fue coaccionado a testar mediante la violencia la intimidación o el dolo, a este no debe negársele el derecho a impugnar el testamento, ya que en esa circunstancia el testador carece de capacidad para revocarlo, cambiarlo o modificarlo en vida. En tales casos, el tutor debe estar legitimado para impugnar la validez del testamento, puesto que al testador no le sería posible hacerlo. Sobre esto, véase Lacruz, J.L. *Anotaciones al Derecho Sucesorio,* de J. Binder, Barcelona, 1953, págs. 86-87 y 90, según citados por Francisco Javier Sánchez Calero en *Comentarios al Código Civil y Compilaciones Forales,* Dirigidos por Manuel Albaladejo, T. IX, Vol. 1-A, Edersa, 1990 pág. 195.

De este modo, si doña Cándida Herminia Sotomayor Flores estuviese incapacitada, el tribunal tiene autoridad para así decretarlo a instancia de familiares y nombrarle un tutor quien, de estimarlo procedente, estaría legitimado para solicitar el amparo de la autoridad judicial, con el fin de proteger su verdadera voluntad mediante una acción de impugnación de testamento.

Ante tal estado de derecho, en el caso de autos el tribunal recurrido no debió desestimar la demanda presentada por el aquí peticionario, ya que sus alegaciones son susceptibles de ser enmendadas, con el fin de solicitar que se decrete la incapacidad de la testadora y se le nombre un tutor, si así lo interesaran los demandantes y procediese en derecho. Máxime, cuando de los autos surge que en la contestación a la demanda, los demandados-recurridos incluyeron una reconvención en la cual solicitan, entre otros remedios, que el tribunal le nombre un defensor judicial a doña Cándida Herminia Sotomayor Flores, en vista de las alegaciones del demandante sobre su alegada

falta de capacidad mental.

Por otro lado, debemos apuntar que en la sentencia cuya revisión se solicita, el tribunal *a quo* dispuso la desestimación de la demanda, pero no dispuso nada respecto a la reconvención instada por los demandados, por lo que este caso no se debe tratar como una apelación, sino como una petición de *certiorari*.

Por los fundamentos expuestos, respetuosamente disiento de la mayoría de los jueces que constituyen el Panel, y hubiera expedido un auto de *Certiorari*, para dejar sin efecto la sentencia parcial recurrida y devolver el caso para que se le brinde la oportunidad a los peticionarios para que enmienden su demanda si así lo interesan y para que continúen los procedimientos relacionados con lo planteado en la reconvención, de manera consistente con lo que aquí se señala.

**RAFAEL ORTIZ CARRION**
**Juez de Apelaciones**