# 2006 DTA 84

**TRIBUNAL DE APELACIONES**
**CIRCUITO REGIONAL DE PONCE Y AIBONITO**
**PANEL ESPECIAL**

VÍCTOR MANUEL LÓPEZ RIVERA, *ET ALS*
Apelantes

v.

AGUSTÍN LÓPEZ ALICEA, *ET ALS*
Apelados

Núm. KLAN-03-00949

San Juan, Puerto Rico, a 6 de junio de 2006

Panel integrado por su Presidente, el Juez Brau Ramírez,
y las Juezas Coll Martí y Pabón Charneco

Coll Martí, Jueza Ponente

## TEXTO COMPLETO DE LA SENTENCIA

Los apelantes de epígrafe nos solicitan que revisemos una *Sentencia* emitida por el Tribunal de Primera Instancia, Sala Superior de Aibonito. Mediante el referido dictamen, el foro *a quo* declaró *Ha Lugar* una *Moción de Reconsideración* y emitió una nueva Sentencia, en la que decretó *No Ha Lugar* una Demanda presentada por los apelantes en la que impugnaban el testamento de una anciana sin descendientes ni ascendientes. La testadora designó al apelado Agustín López Alicea como su único y universal heredero.

Por las razones que expresamos a continuación, CONFIRMAMOS la Sentencia apelada por fundamentos distintos a los esbozados por el Tribunal de Primera Instancia.

### I. Los Hechos:

Doña María Margarita López Santiago otorgó un testamento abierto el 20 de febrero de 1995. En el mismo, instituyó heredero universal de sus bienes a Don Agustín López Alicea (en adelante el apelado) su hermano de medio vínculo. Los bienes de la causante sujetos a partición, conforme surgen de la Demanda, incluyen una

finca de 16.20012 cuerdas sita en el pueblo de Aibonito, bienes muebles tales como certificado de depósito, cuentas de inversiones, valores depositados, mobiliario y demás. Véase *Demanda*, folio 39, en Apéndice de Apelación. Del expediente apelativo trasciende que la testadora había otorgado "*un testamento previo ante el notario Don Pablo Cruz Marcano, Escritura 149 de 28 de diciembre de 1992, en la que instituia como único heredero de sus bienes a la Sociedad de Educación y Rehabilitación de Puerto Rico*". Véase *Sentencia*, folio 11, en Apéndice de Apelación. Doña María Margarita falleció el 12 de abril de 1998.

Así las cosas, los apelantes, -hermanos de medio vínculo y sobrinos de Doña María Margarita-, presentaron una *Demanda* sobre Nulidad de Testamento contra el apelado. En apoyo a su posición adujeron que:

"*[a] la fecha de otorgamiento de la Escritura de Testamento, la causante estaba total y absolutamente incapacitada para otorgar la misma...la causante padecía de "Demensia [sic] degenerativa senil con psicosis", en unión a otras condiciones de origen orgánico, la cual le impedían discernir y/o comprender la naturaleza de sus propios actos....*". Véase *Demanda* folio 39, en Apéndice de Apelación.

Asimismo, los apelantes arguyeron que el testamento era nulo, debido a la "*ausencia de idoneidad*" de los testigos, fundamentando su alegación en que los mismos no conocían a la testadora del modo que requiere la ley. Véase *Demanda*, folio 39, en Apéndice de Apelación. Por su parte, el apelado presentó la *Contestación a la Demanda* en la cual negó las alegaciones de la Demanda y presentó una *Reconvención*, la que fue declarada no ha lugar.

Luego de múltiples trámites procesales, un extenso juicio y la vasta presentación de prueba pericial, el Tribunal de Primera Instancia emitió una *Sentencia* en la que decretó nulo el testamento otorgado por Doña María Margarita el 20 de febrero de 1995. Cabe señalar, conforme a los autos, que los familiares de la testadora habían comenzado anteriormente un procedimiento de incapacidad judicial con el fin de que se le nombrara un tutor a Doña María, debido a que según arguyeron, ésta no podía valerse por sí misma. A raíz de lo anterior, el Tribunal de Primera Instancia acotó en su Sentencia:

"*Durante el proceso de Vista fue puesto el Tribunal en conocimiento de un procedimiento previo que se instó en esta misma jurisdicción para declarar incapacitada por Resolución Judicial a la Testadora, incidente que quedó inconcluso por desistimiento de los peticionarios. Llama la atención el hecho de quien actúa como Notario en el Testamento actuó como Abogado en el proceso, por lo que conocía o debió conocer de la alegada o posible incapacidad mental de la Testadora. También se desfiló prueba médica de las enfermedades que padecía la causante, la vasta mayoría de ellas progresivas, de índole degenerativa. consecuencia entre otros por la avanzada edad de Doña Margarita.*" Véase Sentencia, folio 9.

Como mencionáramos, inicialmente el Tribunal de Primera Instancia declaró Ha Lugar la Demanda de Nulidad, basando su dictamen en que el testamento adolecía de varias faltas notariales y atendiendo la incapacidad mental de la testadora al momento de otorgar el testamento. A estos extremos, se expresó el foro apelado en su Sentencia:

"*El requerimiento que el Notario hiciera a un psiquiatra dos meses antes del otorgamiento sobre la condición mental de la testadora, a nuestro juicio no compensa, cumple o satisface el requisito de la presencia del facultativo al momento de otorgamiento. La actuación del Notario de solicitar esta evaluación abona la teoría de que la Testadora padecía de alguna condición limitante o al menos habría una duda bien fundada sobre ello.*"

Por otro lado y como leemos del texto de la escritura que inicia este segmento, describen a una otorgante "*en el uso pleno de sus facultades mentales, teniendo sano y cabal juicio, perfecto uso de la razón*", y "*siendo su memoria clara, su habla expedita y se expresa con toda claridad*" (Escritura 54, *supra*), lo que contrasta

grandemente con lo vertido por los testigos, quienes la describieron como *"sentadita y quieta"*, *"a la que le temblaban las manos"* y que se veía *"enfermita"*, y los del propio Notario, quien requirió de dos testigos para tomar las huellas de la causante, por que estaba *"tembluzca"*. Véase Sentencia, folio 15 en Apéndice de Apelación.

La Declaración de Nulidad de Testamento acarreó la inconformidad del apelado, quien ante ello, presentó una *Moción de Reconsideración* en el foro de instancia. En su argumentación, el apelado arguyó que la interpretación de la prueba testifical y pericial por parte del foro apelado fue errónea, específicamente, el cuestionamiento sobre la capacidad mental de la testadora al momento de testar. A raíz de lo anterior, la referida moción fue declarada con lugar y, en consecuencia, la Demanda sobre Nulidad de Testamento presentada por los apelantes fue desestimada. Precisa destacar que en la Sentencia Reconsiderada, el Tribunal de Primera Instancia explicó de esta manera los motivos que sustentaron la reconsideración:

*"Emitimos nuestro dictamen basado en los aspectos procesales y de estricto cumplimiento del derecho notarial que a juicio nuestro debieron observarse por el Notario autorizante. Es en virtud de esos "defectos", que consideramos adolecía o se cometieron durante el otorgamiento del documento, que decretamos la invalides (sic) del mismo. No obstante, como resultado de la solicitud de reconsideración, hemos tenido ocasión de profundizar en las alegaciones de la Demanda, en la contestación, en los escritos sometidos y repasar las incidencias surgidas en el transcurso de las Vistas Evidenciarias, y todo ello en conjunto nos mueven a reconsiderar nuestra determinación previa....*

*Si bien es cierto que aun consideramos que los errores y deficiencias notariales fueron cometidas, observamos que la súplica para la nulidad en el testamento según reza de la Demanda lo es por otros fundamentos. Y esos otros fundamentos son lo que analizados en conjunto nos obligan al cambio de determinación."* (Énfasis nuestro.) Véase Sentencia Reconsiderada, folio 2 en Apéndice de Apelación.

Destacó el foro apelado en su Sentencia Reconsiderada:

*"**[e]s al aspecto notarial que el Tribunal y no la parte demandante, concede la importancia que a juicio nuestro debió dársele de manera que conllevara la invalidación todo lo actuado en el Testamento. No obstante, el demandante no presta gran importancia a este asunto, circunscribiéndose a lo relativo a la condición mental en unión a otras condiciones de origen orgánico de la señora Santiago.**

*Es por ello que luego de revisadas cuidadosamente las alegaciones de la Demanda, observamos que este asunto en particular no se presenta como alegación fundamental para que actuáramos.*

*Después de todo, nuestro sistema es uno adversativo de derecho rogado, que descansa en la premisa de que las partes, cuidando sus derechos e intereses, son los mejores guardianes de la pureza de los procesos y de que la verdad aflore. Lloréns Quiñones v. Pierluisi, **2000 J.T.S. 150**."*

Inconformes con la determinación Reconsiderada, los apelantes presentaron ante este Foro una *Apelación* en la cual imputan al Tribunal de Primera Instancia la comisión de los siguientes errores:

*"**1. Erró el Tribunal de Instancia al emitir una Sentencia (Reconsiderada) la cual no está sustentada por la prueba aportada por las partes, ni por los hechos considerados como hechos probados por el Tribunal.**

*2. Erró el Tribunal de Instancia al dejar sin efecto la Sentencia emitida el 10 de febrero de 2002, decretando la nulidad del testamento cuya impugnación se realizó mediante Demanda y la cual estuvo sustentada por la prueba admitida.*

*3. Erró el Tribunal de Instancia al emitir Sentencia (Reconsiderada) que, en sus propios términos, es contraria a los hechos que consideró probados el Honorable Tribunal.*

*4. Erró el Tribunal de Instancia al emitir Sentencia (Reconsiderada) que es contraria a la prueba."*

Aprobada y sometida la exposición narrativa de la prueba oral desfilada en el juicio y contando con la comparecencia del apelado en *Alegato de la Parte Apelada*, estamos en posición de resolver. Así lo hacemos.

## II. El Derecho:

Es norma reiterada que la apreciación de la prueba efectuada por los tribunales sentenciadores gozará de gran respeto y deferencia. Fundamento de ello es el hecho de que dichos foros son quienes tienen la oportunidad de ver y observar a los testigos mientras deponen, evaluar sus gestos y justipreciar sus dudas y contradicciones. Al apreciar la prueba ante su consideración, los tribunales apelativos no habrán de pasar juicio sobre la credibilidad de los testimonios ofrecidos ante el foro de instancia y sustituirlo por el criterio propio. Ello es así, porque el Tribunal de Primera Instancia es el foro ante el cual declararon los testigos y el cual tuvo la oportunidad de apreciar el comportamiento, evaluar la veracidad del testimonio y dirimir cualquier conflicto que surgiera en el proceso. *Argüello v. Argüello*, 155 D.P.R. 62, 79 (2001); *Pueblo v. Dávila Delgado*, 143 D.P. R. 157 (1997); *Pueblo v. Chévere Heredia*, 139 D.P.R. 1 (1995). En consecuencia, es un principio cardinal que los foros apelativos no intervendrán con las determinaciones efectuadas por los magistrados de instancia a menos que en las mismas exista error manifiesto o que éstos hayan actuado movidos por prejuicio, parcialidad o pasión. *Argüello v. Argüello, supra,* a la pág. 79; *Monllor v. Soc. de Gananciales*, 138 D.P.R. 600, 610 (1995).

De otra parte, el testamento es uno abierto, siempre que el testador manifieste su última voluntad en presencia de las personas que deben autorizar el acto, quedando enteradas de lo que en él se dispone. Art. 628 del Código Civil, 31 L.P.R.A. § 2144. Deberá ser otorgado ante notario y tres testigos idóneos que vean y entiendan al testador y de los cuales uno, a lo menos, sepa y pueda leer y escribir. Sólo se exceptuarán de esta regla los casos expresamente determinados en el subcapítulo V sobre testamento abierto. Art. 644 del Código Civil, 31 L.P.R.A. § 2181. En dicho testamento, el testador expresará su última voluntad al notario y a los testigos, el cual deberá ser redactado con arreglo a ella y con expresión del lugar, año, mes, día y hora de su otorgamiento y leerse en alta voz, para que el testador manifieste si está conforme con su voluntad. Tanto el testador como los testigos podrán leer por sí mismos el testamento, debiendo el notario advertirles de éste su derecho. Si el testador y los testigos estuviesen conformes, el testamento será firmado en el acto por uno y por otros que puedan hacerlo. Si el testador declara que no sabe o que no puede firmar, lo hará por él y a su ruego, uno de los testigos instrumentales u otra persona, dando fe de ello el notario. Lo mismo se hará cuando alguno de los testigos no pueda firmar.

El notario hará siempre constar que, a su juicio, se halla el testador con la capacidad legal necesaria para otorgar testamento. Art. 645 del Código Civil, 31 L.P.R.A. § 2182. Todas estas formalidades se practicarán en un sólo acto, sin que sea lícita ninguna interrupción, salvo la que pueda ser motivada por algún accidente pasajero. El notario dará fe, al final del testamento, de haberse cumplido dichas formalidades y de conocer al testador o a los testigos de conocimiento en su caso. Art. 649 del Código Civil, 31 L.P.R.A. § 2186. Según el Art. 634 del Código Civil, 31 L.P.R.A. § 2150, el notario y dos de los testigos que autoricen el testamento deberán conocer al testador y si no lo conocieren, se identificará su persona con dos testigos que le conozcan y sean conocidos del mismo notario y de los testigos instrumentales. También procurarán el notario y los testigos asegurarse de que, a su juicio, tiene el testador la capacidad legal necesaria para testar. Para apreciar la capacidad del testador se atenderá únicamente al estado en que se halle al tiempo de otorgar el testamento. Art. 615 del Código Civil, 31 L.P.R.A. § 2115. La apreciación de la capacidad mental del testador debe ser hecha con referencia al momento mismo del otorgamiento del acto testamentario. El hecho de que antes de una persona testar, contra ella se iniciara un procedimiento de incapacidad mental -que quedó sin determinar-, no

implica de por sí que el testador estuviera incapacitado. *Jiménez v. Jiménez*, 76 D.P.R. 718 (1954).

El Código Civil de Puerto Rico exige el cumplimiento de todas las formalidades indispensables para dar validez a cualquier testamento. Si no se cumple la forma delineada por el estatuto, no existe testamento. Ahora bien, la solemnidad testamentaria se refiere a requisitos esenciales para garantizar la autenticidad y la veracidad de la voluntad del testador, por lo que no todas las omisiones en que pueda incurrir un notario necesariamente vician de nulidad el testamento. Art. 636 del Código Civil, 31 L.P.R.A. sec. 2152; *Paz v. Fernández*, 76 D.P.R. 742, 752-753, 748 (1954); *In re: Maldonado Rivera*, 159 D.P.R. ___ (2003), 2003 J.T.S. 58.

### III. Aplicación del Derecho:

Los apelantes imputan al foro *a quo* la comisión de cuatro errores que, en el análisis final, plantean la misma cuestión, a saber, que incidió al emitir una Sentencia Reconsiderada en la cual se niega a anular el testamento impugnado, pues, a base de la prueba presentada, el testamento otorgado es nulo. En su argumentación aluden a que el tribunal de instancia, al emitir la Sentencia Reconsiderada, actuó contrario a los hechos que consideró probados en su Sentencia original y ratificados en la Sentencia Reconsiderada. Por estar intrínsecamente relacionados, discutiremos en conjunto los señalamientos de error.

Conforme surge de la Sentencia, el tribunal apelado entendió que *"el mapa a seguir en nuestro análisis es el siguiente: ¿Se observaron todas las formalidades que exige la ley? ¿Es válida la escritura?"*. Véase *Sentencia*, folio 8, en Apéndice de Apelación. Conforme a esas exigencias, los hechos que estimó probados el Tribunal de Primera Instancia en su Sentencia y ratificados en la Sentencia Reconsiderada ██ fueron los siguientes:

*"1. Que Doña María Margarita López Santiago t/c/p Margarita López Santiago falleció el 12 de abril de 1998, dejando bienes sujetos a partición.*

*2. Que la causante otorgó Testamento ante el Notario Don Juan Ortiz Martínez.*

*3. Que la causante padecía de epilepsia y de demencia senil precoz condición degenerativa e irreversible.*

*4. Que previo a su fallecimiento y al otorgamiento del Testamento fue instado un procedimiento de Incapacidad Judicial por los familiares de ésta, que quedara inconcluso ante el desistimiento por parte de los Peticionarios.*

*5. Que la causante estuvo residiendo antes y posterior al otorgamiento en varios asilos. Véase Sentencia, folio 8 en Apéndice de Apelación."*

No obstante, un examen de la Demanda presentada por los apelantes nos mueve a cuestionar la base del análisis seguido por el Tribunal de Primera Instancia. Luego de evaluadas las alegaciones, el examen reflejaría, entonces, un análisis bajo el siguiente escrutinio: ¿Estaba incapacitada mentalmente Doña María Margarita al momento de otorgar el testamento? ¿Los testigos que comparecieron al otorgamiento eran idóneos? Véase *Demanda*, folios 37-40, en Apéndice de Apelación. Ante nuestra consideración, los apelantes impugnan que las determinaciones de hechos del tribunal sentenciador no coinciden con la determinación de desestimar la Demanda.

Ahora bien, como señaláramos, el tribunal de instancia en su Sentencia Reconsiderada indicó que el testamento contenía serias faltas notariales que implicaban la nulidad del mismo, pero que no obstante lo anterior, los apelantes fallaron en presentar alegaciones que atacaran las formalidades del testamento. ██ Nos preocupa semejante aseveración. No podemos avalar el fundamento utilizado por el tribunal sentenciador de

que en nuestra jurisdicción rige el derecho rogado y que, por tanto, no procedería declarar nulo un testamento que contenga faltas que lo conviertan en radicalmente nulo si se pidió su nulidad por otras razones. Si estuviéramos ante el supuesto de un testamento impugnado que por incumplimiento con las formalidades y solemnidades de ley fuese nulo, el tribunal apelado tendría que, de esa manera, expresarlo en la Sentencia Reconsiderada y tendría que declarar la nulidad del mismo. El Código Civil de Puerto Rico exige el cumplimiento de todas las formalidades indispensables para dar validez a cualquier testamento. Si no se cumplen los requisitos esenciales delineados por el estatuto, no existe testamento. Aun cuando las partes en un litigio no han rogado su justicia —es decir, lo que les corresponde según el derecho—, nuestro sistema de adjudicación todavía tiene una misión que realizar. Lo ha dicho nuestro Tribunal Supremo: *"aunque el nuestro sea un sistema adversativo de derecho rogado, un tribunal no tiene que conceder lo que se le pide; su deber es sólo conceder lo que en derecho proceda."* P.P.D. v. Gobernador II, 139 D.P.R. 984 (1996). La nulidad de un testamento no puede, pues, ser obviada por un tribunal bajo ninguna circunstancia. Éste viene obligado a conceder lo que en derecho proceda.

Es debido a las erradas determinaciones emitidas por el tribunal apelado sobre el incumplimiento con las formalidades y solemnidades del testamento abierto, que los apelantes impugnan la Sentencia Reconsiderada y aducen que la misma no está sustentada por la prueba aportada. Veamos, entonces, si en realidad las faltas notariales contenidas en el testamento lo convertían en nulo.

## A) Formalidades y Solemnidades

En su Sentencia, el foro apelado concluyó que el testamento era nulo atendiendo lo que consideró *"errores y deficiencias notariales"*, en cuanto a la fecha, hora, testigos instrumentales, lectura del testamento y la firma. El testamento abierto es un instrumento público y, como regla general, el otorgamiento y las formalidades de los instrumentos públicos se rigen por la Ley Notarial de Puerto Rico, 4 L.P.R.A. secs. 2001 y ss. No obstante, *"lo dispuesto en los Arts. 13 al 35 de esta Ley [4 L.P.R.A. secs. 2031 a 2053] respecto a la forma de los instrumentos y su nulidad, no es aplicable a los testamentos y demás disposiciones mortis causa, las cuales se rigen por el Código Civil, 31 L.P.R.A. sec. 1 y ss."* Art. 36 de la Ley Notarial, 4 L.P.R.A. § 2054.

Las formalidades testamentarias han sido clasificadas en dos grupos, a saber, las formalidades de fondo y las formalidades externas o de forma. *Paz v. Fernández, supra.* Las formalidades de fondo han sido definidas por el Tribunal Supremo de Puerto Rico como *"aquellas que la ley exige que aparezcan expresamente consignadas en la escritura del testamento. Su cumplimiento deberá surgir expresamente de la faz del documento, sin que pueda subsanarse la omisión de este requisito mediante la presentación de prueba extrínseca o por la dación de fe general de que se han cumplido todas las formalidades exigidas por ley. En este caso y tratándose de requisitos esenciales, su inobservancia produce ab initio la nulidad del testamento."* Deliz et als. v. Iguartúa, 158 D.P.R. ___ (2003), **2003 J.T.S. 7**; Paz v. Fernández, supra, a la pág. 752.

Es decir, cuando el Código Civil ordena que se haga constar expresamente algún requisito en el testamento, la omisión de ese requisito es fatal para la validez del acto y no puede ser subsanada por la certificación de haberse observado todas las formalidades de la ley. No obstante, si lo omitido por el notario es algo que la ley no exige que se consigne expresamente en el testamento, bastará que el notario de fe de haberse observado todas las formalidades exigidas por el Código Civil. Pacheco v. Sucesión Pacheco, 66 D.P.R. 796, 801-802 (1947). En ese grupo caen las formalidades externas o de forma. Como no tienen que surgir expresamente del testamento, aunque deben ser observadas, so pena de nulidad, es suficiente la dación de fe general del notario para presumir que se han cumplido todas las formalidades de la ley, salvo prueba en contrario. *Deliz et als. v. Igartúa et als., supra.*

Múltiples son las formalidades que el Código Civil requiere en el otorgamiento del testamento abierto. Sobresalen entre ellas la identificación del testador por el notario y los testigos instrumentales y la acreditación

de su capacidad para testar. Ambas tienen carácter solemne y tienen que surgir de la faz del documento. Siendo requisitos de fondo, su inobservancia acarrea la nulidad del testamento. *Deliz et als. v. Igartúa et als., supra*, a la pág. 425; Federico Puig Peña, *Tratado de Derecho Civil Español*, T. V, Vol. I, 165-166 (EDERSA 1974).

El Art. 644 del Código Civil, 31 L.P.R.A. § 2181, dispone, en lo que es pertinente al caso de autos, que el testamento abierto "*deberá ser otorgado ante notario y tres testigos idóneos que vean y entiendan al testador*". Por otro lado, el Art. 634, 31 L.P.R.A. § 2150, aplicable a cualquier testamento en que intervengan testigos, establece que: "*[e]l notario y dos de los testigos que autoricen el testamento deberán conocer al testador*".

De un examen del testamento surge que en el mismo se hizo constar que "*ha sido preparado de acuerdo a la voluntad de la Testadora*" y más adelante, "*lo escrito expresa fielmente su voluntad, sin que haya necesidad de añadir, quitar o modificar frase o concepto, ratificándolo en todas sus partes*". De igual manera, se cumplió con expresar el día, mes, año y hora del otorgamiento, al haberse hecho constar que se otorgó el 18 de febrero de 1995 a las 9:22 de la mañana. Como bien indicó el tribunal sentenciador, existe una discrepancia entre la fecha indicada en palabras y aquélla indicada en paréntesis. Sabemos que las palabras prevalecen sobre los números. Estamos, pues, ante una falta notarial que no convierte el testamento en nulo.

En cuanto al requisito de que el testamento se leyera en voz alta y la testadora manifestara si el mismo estaba conforme a su voluntad, el testamento en cuestión hizo referencia a que se leyó en voz alta. Respecto a la formalidad de que el notario le advirtiera a la testadora y a los testigos de su derecho de leer el testamento, trasciende del testamento que así se hizo. En cuanto a la firma del testador -en este caso sus huellas digitales, por las que comparecieron dos testigos de marca- y de los testigos, las mismas deben aparecer en todas las páginas. Así surge de la copia certificada cancelada por el Notario.

Finalmente, el Art. 649 del Código Civil, *supra*, establece el requisito de que todas las formalidades se practiquen en un sólo acto, sin que haya interrupción y que el notario de fe al final del testamento de haberse cumplido con todas las formalidades, así como de conocer al testador. En cuanto a ello, el notario precisó lo siguiente:

"*He hecho a la Testadora y los Testigos las advertencias de ley, de las cuales dicen quedar bien enterados, y he observado en todo este acto de otorgamiento todos los requisitos legales exigidos por las leyes de Puerto Rico, efectuándose el mismo en un sólo acto, continuo e ininterrumpido.*"

Surge que los requisitos para un otorgamiento válido de testamento abierto son: la presencia del Notario, los tres testigos idóneos, la expresión del lugar, año, mes, día y hora del otorgamiento, la lectura en voz alta, la manifestación de la voluntad por parte del testador, la firma por las personas que sepan y puedan hacerlo, la observancia del requisito de unidad de acto y la dación de fe del Notario autorizante, en torno a la observancia de determinados requisitos de ley. E. González Tejera, *Derecho Sucesorio Puertorriqueño*, San Juan, Ramallo Bros., 1983, Vol. II, pág. 154.

Recapitulando, de las formalidades requeridas por el Código Civil para el otorgamiento de un testamento válido, el notario incumplió en este caso con las siguientes formalidades: (1) no especificó el domicilio de dos de los testigos; (2) hay discrepancia entre la fecha indicada en palabras y aquélla indicada en paréntesis. [3] La pregunta forzada es, entonces, si es nulo el testamento otorgado por Doña María Margarita por carecer de estas formalidades.

El Tribunal Supremo de Puerto Rico ha señalado que no todas las omisiones en que pueda incurrir un notario necesariamente vician de nulidad el testamento. *Paz v. Fernández, supra*, a las págs. 752-753. Por el contrario, ha distinguido entre aquellas omisiones que pueden ser subsanadas y las que, por no serlo, provocan la nulidad absoluta del acto testamentario. *Deliz et als v. Igartúa et. Als., supra*. Un análisis de los autos y de la

jurisprudencia aplicable nos mueven a concluir que las formalidades omitidas no vician de nulidad el testamento. Un examen de la prueba presentada reflejaría el mismo resultado. Las faltas cometidas no convierten el testamento en uno nulo.

## B) La Prueba

## 1) La ausencia de idoneidad de los testigos

Un testamento puede ser ineficaz por varias razones; una de ellas es la nulidad debido a la ausencia de idoneidad de los testigos. En lo aquí pertinente, el Código Civil establece en el Art. 644 que:

*"El testamento abierto deberá ser otorgado ante notario y tres testigos idóneos que vean y entiendan al testador, y de los cuales uno, al menos, sepa y pueda leer y escribir".*

En cuanto a la idoneidad de los testigos que pueden comparecer en un testamento, el Código Civil dispone lo siguiente:

*"No podrán ser testigos en los testamentos:*

*1. Los menores de edad.*

*2. Los que no tengan la calidad de vecinos o domiciliados en el lugar del otorgamiento, salvo en los casos exceptuados por la ley.*

*3. Los ciegos o los totalmente sordos o mudos.*

*4. Los que no entiendan el idioma del testador.*

*5. Los que no estén en su sano juicio.*

*6. Los que hayan sido condenados por el delito de falsificación de documentos públicos o privados, o por el de falso testimonio, y los que estén sufriendo pena de interdicción civil.*

*7. Los dependientes, amanuenses, criados, ni persona otra alguna que trabaje en la misma oficina, o sea socio, o pariente dentro del cuarto grado de consanguinidad o segundo de afinidad del notario autorizante."* 31 L.P.R.A. sec. 2146.

La idoneidad de los tres testigos que tienen que comparecer en un testamento abierto, se cualifica según el Art. 631, 31 L.P.R.A. sec. 2147:

*"En el testamento abierto tampoco podrán ser testigos los herederos y legatarios en él instituidos, ni los parientes de los mismos dentro del cuarto grado de consanguinidad o segundo de afinidad.*

*No están comprendidos en esta prohibición los legatarios y sus parientes, cuando el legado sea de algún objeto o mueble o cantidad de poca importancia con relación al caudal hereditario."*

El Tribunal Supremo ha resuelto, en repetidas ocasiones, que la comparecencia de tres testigos idóneos es un requisito formal para la validez del testamento en ausencia del cual el testamento es nulo. *In re: Luis A. Rivera Vázquez*, 155 D.P.R. 267 (2001). El notario, como profesional del derecho investido de la fe pública notarial, está obligado a asegurarse fehacientemente de la idoneidad de los testigos que comparecen a un testamento abierto.

En el caso que nos ocupa, el testamento se otorgó ante un notario. Además, se hizo constar en el folio primero que estaban presentes los testigos Susie Reyes Malavé, Don Ángel A. Torres Cartagena y Doña Carmen Ortiz Santiago. El notario consignó que conocía personalmente a los testigos; que no tenían tacha legal para serlo; que no se encontraban comprendidos en ninguno de los casos de incapacidad absoluta o relativa señaladas por el Código Civil y otras leyes; que veían, oían, entendían al testador y aseguraban conocerlo personalmente; que el notario conocía al testador y a los testigos, dando fe de ello, así como de sus circunstancias personales. Verificado el testamento, advertimos que todos estos requisitos formales fueron satisfechos por el notario en la escritura. Así mismo, surge de la prueba estipulada que todos los testigos conocían a Doña María Margarita y que podían dar fe de su capacidad al momento del otorgamiento. Aun cuando la describían como temblorosa y nerviosa, esas características de por sí no son impedimento legal que priven a la testadora de expresar su última voluntad en un testamento. La doctrina expuesta anteriormente es clara en cuanto a que las faltas notariales de forma -la omisión de incluir el domicilio de dos de los testigos-, no invalidaba el testamento, como concluyó el foro de instancia en la Sentencia. Los apelantes fallaron en establecer con preponderancia de prueba que los testigos instrumentales no conocían a la testadora. Una lectura de la exposición narrativa de la prueba y de la escritura confirma que los testigos sí conocían a Doña María Margarita. Véase *Exposición Narrativa Estipulada*. El requisito del conocimiento es a los efectos de que éstos puedan dar fe de la capacidad mental de la testadora. Así lo hicieron.

## 2) La incapacidad mental de la testadora

En materia de la capacidad mental necesaria para otorgar un testamento, el Código Civil incluye varias disposiciones en los Arts. 612 a 615, 31 L.P.R.A. secs. 2112-2115. En general, se reconoce: que existe una presunción de sanidad mental y que, de todos modos, lo importante es la capacidad mental del testador *al momento de testar,* sin admitirse prueba de incapacidad mental antes o después del acto de otorgar el testamento. Quien impugne la capacidad del testador por condición mental tiene el peso de probarlo con evidencia *robusta y completa. Jiménez v. Jiménez,* 76 D.P.R. 718, 733 (1954). De hecho, según dispone el Art. 613 del Código Civil, el testamento hecho *antes* de la enajenación mental es válido. 31 L.P.R.A. sec. 2113.

La presunción de sanidad mental que generalmente prevalece en cuanto a las personas en general, es aplicable a la capacidad de un testador. Dicha capacidad mental, pues, se presume mientras no se destruya por una prueba concluyente en contrario. *Jiménez v. Jiménez, supra.* El que impugna la validez de un testamento por incapacidad mental del testador, tiene el peso de la prueba. Tal peso no se sostiene a través de prueba de incapacidad en una época anterior o posterior al acto testamentario o por incapacidad temporal, intermitente u ocasional y sí a través de prueba de incapacidad mental de carácter habitual, continuo o crónico. *Jiménez v. Jiménez, supra.*

Es preciso notar que, incluso aquel que ha sido declarado demente mediante determinación judicial, puede testar. *Jiménez v. Jiménez, supra.* En efecto, el Art. 614 del Código Civil dispone:

*"Siempre que el demente pretenda hacer testamento en un intervalo lúcido, designará el notario dos facultativos que previamente le reconozcan, y no lo otorgará sino cuando éstos respondan de su capacidad, debiendo dar fe de su dictamen en el testamento, que subscribirán los facultativos además de los testigos."* 31 L.P.R.A. sec. 2114.

Es decir, incluso una persona declarada demente judicialmente puede testar, siempre que se encuentre en un intervalo lúcido y que se tomen las medidas para evidenciar, por los profesionales capacitados, la sanidad mental al momento de otorgar el testamento. Ha dicho el Tribunal Supremo que la norma a seguir, en casos civiles, es determinar si el contratante, enfermo mental, tiene la capacidad mental suficiente para darse cuenta del acto que realiza. *Rivera v. Sucn. Díaz Luzunaris,* 70 D.P.R. 181 (1949).

En las alegaciones de la Demanda, los apelantes impugnaron la capacidad metal de la testadora y citamos *"a la fecha de otorgamiento de la Escritura de Testamento, la causante estaba total y absolutamente incapacitada*

*para otorgar la misma....".* Los testimonios vertidos por los profesionales de la conducta humana, peritos de ambas partes y los testigos que comparecieron al otorgamiento de la escritura de testamento no pudieron establecer con certeza la incapacidad de la testadora. Más aún, el Tribunal de Primera Instancia falla en establecer claramente si Doña María Margarita se encontraba incapacitada mentalmente al momento del otorgamiento. Véase Sentencia, folio 15, en Apéndice de Apelación; véase, además, *Sentencia Reconsiderada*, folio 2-3, en Apéndice de Apelación. El Tribunal de Primera Instancia precisó que los apelantes se limitaron a impugnar la capacidad mental de la testadora en los momentos anteriores al otorgamiento. Véase *Sentencia Reconsiderada*, folio 3, en Apéndice de Apelación. En la Sentencia Reconsiderada, el tribunal sentenciador utilizó este lenguaje abstracto:

*"Desfilada la evidencia médica, ésta no es la que nos convenciera de que la señora estuviese incapacitada mentalmente al momento de otorgarse la escritura; pesó más lo que observamos y escuchamos en los testimonios de los presentes al momento del otorgamiento, lo que hizo la diferencia (observación de la conducta de la otorgante, su comportamiento y manera de actuar el día del otorgamiento). Todos ofrecieron versiones, observaciones distintas, lo que coloca sobre el notario la responsabilidad de subsanar esa situación.... La manera en que éste (el Notario) describe a la Testadora, no concuerda con lo que apreciaron los testigos. A nuestro juicio, el notario no salvó la situación, y ello es lo que recogimos en la Sentencia primera que emitiéramos."*

Ante ello, este Foro estima pertinente ahondar en la prueba, a los efectos de determinar si Doña María Margarita contaba o no, al momento de otorgar el testamento, con la capacidad mental requerida para realizar un acto de tal envergadura.

Doña María Margarita tenía una condición de *"demencia degenerativa senil con psicosis"*, diagnosticada con anterioridad al otorgamiento del testamento. Se define la demencia como una perturbación mental de tipo orgánico caracterizada por una pérdida general de las facultades intelectuales y que afecta a la memoria, al juicio y al pensamiento abstracto, así como a cambios de la personalidad. *Diccionario Enciclopédico Ilustrado de Medicina Dorland*, Volumen I, Interamericana, McGraw-Hill, 1992, pág. 461. El Art. 615 del Código Civil establece que para apreciar la capacidad del testador, se atenderá únicamente al estado en que se halle al tiempo de otorgar el testamento. 31 L.P.R.A. sec. 2115. La *"demencia"* es definida conforme el American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition, Washington D,C, Ed. DSM-IV-TR, 2000, págs. 147-154:

*"is the development of multiple cognitive deficits that include memory impairment and at least one of the following cognitive disturbances: aphasia, apraxia, agnosia, or a disturbance in executive functioning. The cognitive deficits must be sufficiently severe to cause impairment in occupational or social functioning and must represent a decline from a previously higher level of functioning."*

Durante el juicio, y como parte de la prueba de los apelantes, testificaron el Dr. Antonio D. Thomas, Jr., médico psiquiatra; el Dr. Miguel Cubano Muñiz, médico psiquiatra; Dr. Vicente Laboy Ramos, médico especialista en medicina interna y nefrología; el Dr. Bonilla, médico generalista con 12 años de experiencia en pacientes geropsiquiátricos; la Sra. Carmen Sánchez Torres, esposa del sobrino de Doña María Margarita y quien inició un procedimiento de incapacidad judicial de la testadora que luego fue abandonado; Susie Reyes Malavé, testigo instrumental del testamento; la Sra. Elsa M. Rodríguez Colón, testigo instrumental del testamento; el Sr. Ángel A. Torres Cartagena, testigo instrumental del testamento, y el Sr. Gilberto Rivera Ortiz, testigo de marca del testamento.

Según trasciende de la Exposición Narrativa, los testigos aseguraron conocer a la testadora y dieron fe de que ésta se encontraba capacitada para otorgar el testamento. Luego del examen de los testimonios, estimamos que los apelantes centraron su impugnación sobre la capacidad mental en momentos anteriores al otorgamiento, contrario

a lo requerido por el Código Civil que atiende la incapacidad al momento del otorgamiento del testamento. Los apelantes trajeron prueba de hospitalizaciones anteriores -año 1993- en momentos específicos de crisis de Doña María Margarita. De eso no hay duda. No obstante lo anterior, los testimonios vertidos por los peritos y los apelantes nos mueven a concluir que la testadora tuvo una mejoría considerable, por lo que fue dada de alta y, posteriormente, no se ofreció prueba de que su estado mental fuese cuestionable.

Resulta medular destacar que los testigos instrumentales conocían a la testadora y dieron fe de que se encontraba capacitada mentalmente para el otorgamiento; sin prueba en contrario, concluimos que Doña María Margarita expresó su última voluntad en su cabal juicio. Del mismo modo, puntualizamos que ni los peritos de la parte apelante ni los de la parte apelada -aunque coinciden con el diagnóstico de demencia degenerativa de la testadora-, expresaron en qué etapa de la condición se encontraba Doña María Margarita, prueba que sería fundamental para determinar la incapacidad absoluta de la testadora. Un cuidadoso análisis de la exposición narrativa demuestra que la prueba que presentó el apelante no estableció la incapacidad mental de la testadora al momento de otorgar el testamento.

Asimismo, como parte de la prueba presentada por la parte apelada testificaron el Dr. Felipe De Jesús, médico generalista que visitaba el hogar de ancianos donde Doña María Margarita estuvo recluida; el Lcdo. Juan Ortiz Martínez, notario que otorgó el testamento; Dr. Julio Fontánez, siquiatra que evaluó a la testadora; Antonia Torres Díaz, cuñada de la testadora y la Sra. Amelia Morales, dueña del asilo en que murió Doña María Margarita.

Un examen de los testimonios de la parte apelada refleja que la testadora estaba capacitada mentalmente para el otorgamiento. A nuestro juicio y conforme a la prueba desfilada, el que la testadora sufriera de demencia degenerativa y que con ello se haya debilitado, afectado físicamente y que haya mermado su capacidad mental, no significa que estuviese incapacitada para testar. A base de la prueba presentada por la apelada y a la que dio crédito el Tribunal de Primera Instancia-, el foro *a quo* no se convenció de la incapacidad absoluta de la testadora, lo que avala nuestra conclusión de que Doña María Margarita tenía la capacidad legal necesaria para otorgar el testamento en la fecha en que lo hizo. Cualquier cuestionamiento quedó, a nuestro juicio, disipado ante el reconocimiento de que a la testadora se le practicó un Examen Mental, conocido en el campo de la siquiatría como *"Mini-Mental State Examination-Folstein"* con anterioridad al otorgamiento del testamento. El notario que autorizó la escritura, consciente de que anteriormente se había iniciado un procedimiento fallido para incapacitar a Doña María Margarita, requirió la evaluación por parte de un psiquiatra, como mecanismo preventivo en caso de que se impugnara la capacidad mental de la testadora.

El facultativo, así requerido, el Dr. Julio Fontánez, llevó a cabo en diciembre de 1994 el examen mental y evaluación siquiátrica de Doña María Margarita. El referido psiquiatra, en su testimonio y a preguntas del apelado, declaró que *"en relación a Doña Margarita, ésta sabía lo que estaba haciendo, sabía los bienes que tenía y que no estaba siendo coaccionada para ello"*. Continuó declarando sobre el examen mental administrado a la testadora:

*"hizo unas pruebas a base de preguntas tratando de adaptar la cuestión de las memorias y sumamente sencillas, memorias recientes y pasadas. Se valoran a base de un punto si lo contestó bien y cero si contestó mal. Se le dan unas instrucciones, unos ejercicios y se le da un valor total de 30. El resultado por encima de 20, es que se considera que no tiene organicidad y que las personas que están cerca de 20 en la puntuación quiere decir que muestran un cambio de organicidad. Un resultado por debajo de 15 es organicidad severa. Declaró que ella, refiriéndose a doña Margarita, calificó 21 de 30, según él, cae dentro de lo normal. Manifestó que después de los 60, refiriéndose a la edad, se espera que las personas se acerquen al resultado de los 20 puntos."* Véase Exposición Narrativa Estipulada, pág. 58.

Ya nuestra jurisprudencia ha señalado que la demencia senil no es incompatible con la capacidad mental en alguna etapa del desarrollo de la enfermedad. *"La enfermedad, que es progresiva, produce incapacidad mental en*

*su etapa avanzada, mas no así en las etapas intermedias en las cuales puede ocurrir una adecuada capacidad mental."* Jiménez v. Jiménez, *supra*, a la pág. 733.

La capacidad mental de la testadora fue avalada por la prueba presentada por la parte apelada. Aun cuando reconocemos que los testigos la describen como temblorosa y nerviosa durante el otorgamiento, no creemos que esto sea un impedimento legal que incapacitara a la testadora.

## C) La Sentencia Reconsiderada

En la Sentencia, el foro apelado declaró nulo el testamento por lo que consideró *"defectos"* que lo convertían en nulo. En la Sentencia Reconsiderada, el tribunal apelado reflexiona y concluye que, aunque los errores y deficiencias por los que declaró nulo el testamento en primera instancia sí fueron cometidos, la súplica de la Demanda no solicitaba la nulidad por dichos defectos y sí por otros, a saber, la incapacidad de Doña Margarita para testar y el hecho de que los testigos no la conocían. Como dijéramos anteriormente, de ser nulo el testamento, no podría el tribunal ignorar esa nulidad aduciendo que –porque el derecho es rogado– y no se solicitó la nulidad por dichos defectos, no procede declararlo nulo. Sin embargo, analizados los defectos aludidos, concluimos que ninguno de los errores u omisiones cometidos por el Notario constituyen causa de nulidad del testamento, por lo que, en el resultado, no erró el tribunal al reconsiderar su Sentencia y declarar No Ha Lugar la Demanda de impugnación del testamento.

En el ejercicio de nuestra función revisora, se impone la norma de que la revisión de una Sentencia se da contra el dictamen, no contra sus fundamentos. *Pérez Vda. de Muñiz v. Criado*, 151 D.P.R. 355, 374 (2000). En conclusión, no incidió el Tribunal de Primera Instancia al declarar No Ha Lugar la Demanda que procuraba la nulidad del testamento.

## IV. Disposición

Disponemos, pues, CONFIRMAR la Sentencia Reconsiderada.

Lo acuerda y manda este Tribunal y lo certifica la Secretaria.

Laura M. Vélez Vélez
Secretaria del Tribunal de Apelaciones

### ESCOLIOS 2006 DTA 84

**1.** En la Sentencia Reconsiderada, el foro apelado indicó:

*"[l]as Determinaciones de Hechos mencionados en la Sentencia original quedan de manera inalterada y se consideran hechos probados los incisos 1 al 5, página 2 de la Sentencia de 10 de febrero de 2003."*

**2.** El Tribunal de Primera Instancia, en la Sentencia Reconsiderada, acepta que *"los errores y deficiencias notariales fueron cometidas, observamos que la súplica para la nulidad en el testamento según reza de la Demanda lo es por otros fundamentos."* Véase *Sentencia Reconsiderada*, folio 2, en Apéndice de Apelación.

**3.** Descartamos incluir, como incumplimiento, el señalamiento del foro de instancia en su Sentencia sobre que estimaba como un defecto sustancial el conocimiento personal de la testadora. Un examen de la prueba nos mueve a concluir que los testigos sí conocían a la testadora del modo que requiere la ley, lo cual se discutirá más adelante.

**4.** Además, la Ley Notarial de Puerto Rico, 4 L.P.R.A. § 2001, contiene una disposición que prohíbe a determinados parientes del notario o de los otorgantes a servir como testigos instrumentales en un instrumento público. A esos efectos, el Art. 22 de la referida ley, 4 L.P.R.A. § 2040, dispone lo siguiente:

# 2006 DTA 85

**TRIBUNAL DE APELACIONES**
**REGIÓN JUDICIAL DE SAN JUAN**
**PANEL I**